# Exhibit A

**Richard R. Best**
**Lara Shalov Mehraban**
**Sheldon L. Pollock**
**Victor Suthammanont**
**Ladan F. Stewart**
**Mary Kay Dunning**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-5674 (Suthammanont)**
**Email: SuthammanontV@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>      -- against --<br><br>**SIMON PIERS THURLOW,**<br>**ROGER LEON FIDLER, ESQ.,**<br>**RICHARD ORAVEC,**<br>**BRADLEY FIDLER,**<br>**BRYCE EMORY BOUCHER,**<br>**JOSEPH D. JORDAN,**<br>**and WESTERN BANKERS CAPITAL INC.,**<br><br>        **Defendants.** | **21 Civ. ____ ( )**<br><br>**ECF Case**<br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Simon Piers Thurlow ("Thurlow"), Roger Leon Fidler ("Fidler"), Richard Oravec

("Oravec"), Bradley Fidler ("Bradley Fidler"), Bryce Emory Boucher ("Boucher"), Joseph D.

Jordan ("Jordan"), and Western Bankers Capital Inc. (collectively, "Defendants") alleges as

follows:

## SUMMARY OF THE ALLEGATIONS

1.      This case involves a fraudulent scheme, beginning in 2016, to enrich the Defendants through the unlawful offering of securities of Dolat Ventures, Inc. ("DOLV") between March and December 2017.

2.      In late 2016, Fidler, Thurlow, and Oravec engineered a reverse merger between DOLV, a shell company with nominal assets and operations, and a Chinese company that purportedly manufactured electric cars and batteries.

3.      In connection with this transaction, Thurlow, Fidler, and Oravec drafted a falsely backdated convertible DOLV debt instrument that could be converted to more than 141 million shares of DOLV. They knowingly or recklessly backdated the debt instrument to give the appearance that the shares could be immediately sold to investors in the public markets without filing the required registration statements with the Commission prior to their offering.

4.      In February 2017, Thurlow arranged for Boucher and Jordan, through Jordan's nominee company Western Bankers Capital ("WBC"), to purchase the convertible debt (with the proceeds going to Oravec), convert it to DOLV shares, and sell those shares into the public markets. Boucher engaged in multiple such transactions throughout 2017. In doing so, Boucher knowingly or recklessly executed materially false and misleading representation letters in order to obtain an attorney opinion for his broker that the conversions and sales did not violate the law.

5.      In June and July 2017, Fidler and Thurlow deceptively manufactured a second convertible debt instrument that falsely gave the impression that the shares generated by the conversion could be immediately sold to investors in the public markets despite that such shares in fact required registration with the Commission prior to sale. Fidler purchased the debt on behalf of his son, Bradley Fidler, who knowingly or recklessly executed a materially false and

misleading representation letter to obtain an attorney opinion letter for his broker in order to be able to sell his DOLV shares into the public market without restriction.

6.     Bradley Fidler also purchased a tranche of convertible debt from the first falsified note—again knowingly or recklessly executing a materially false and misleading representation letter for an attorney—and sold the resulting DOLV shares into the public market in or about December 2017.

7.     Boucher's, Jordan/WBC's, and Bradley Fidler's unregistered sales generated more than $5.7 million in proceeds, approximately $1.9 million of which were funneled back to Thurlow, Fidler, Oravec, or others related to them.

## VIOLATIONS

8.     By engaging in the conduct set forth in this Complaint:

    a.   Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

    b.   Defendants Thurlow, Oravec, Boucher, and Bradley Fidler violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

    c.   Defendant Fidler violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; and

    d.   Defendants Thurlow, Boucher, Fidler, Bradley Fidler, and Oravec ("Fraud Defendants") aided and abetted each other's violations of Sections 17(a)(1)

and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)], Section

10(b) of the Exchange Act [15 U.S.C. § 78j], and Rules 10b-5(a) and (c)

thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)], and aided and abetted

Thurlow's, Boucher's, Bradley Fidler's, and Oravec's violations of Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j], and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5].

9.      Unless Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, and courses of business set forth in this Complaint, and in acts,

practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by

Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)] and Sections 21(d)(1),

(d)(3), and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(3), and (d)(5)] seeking a final

judgment: (a) permanently restraining and enjoining Defendants from engaging in the acts,

practices, and courses of business alleged herein; (b) requiring Defendants to disgorge with

prejudgment interest ill-gotten gains from the conduct alleged in this Complaint pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], and Sections 6501(a)(1) and

(a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to

be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) imposing civil monetary penalties on

Defendants pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (d) imposing penny-stock bars against

the Defendants pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and

Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)].

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a)

of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d) and (e) and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, made

use of the means or instruments of transportation or communication in, and the means or

instrumentalities of, interstate commerce in connection with the transactions, acts, practices, and

courses of business alleged herein.

12.    Venue is proper in the Southern District of New York pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the transactions, acts, practices, and courses of business constituting the violations

alleged herein occurred in the Southern District of New York, including among other things,

Thurlow, Fidler, and Oravec resided and/or operated business offices within the district;

Thurlow, Oravec, and Boucher conducted meetings concerning the securities sales within the

district; Boucher, Jordan and WBC, and Bradley Fidler made payments to Oravec through his

company Pivo Assoc. Inc. located in the district; and Thurlow, Fidler, and Oravec corresponded

with individuals at OTC Markets based within the district in connection with removing a

cautionary legend on DOLV shares.

## DEFENDANTS

13.    **Thurlow**, age 56, is a resident of New York, New York, and a citizen of the

United Kingdom. Thurlow, who is the purported "law clerk" of Fidler, acts as a consultant to

various individuals and entities with respect to microcap entities. Thurlow previously held a

Series 7 license between approximately 1996 and 1998. He was suspended by the National Association of Securities Dealers ("NASD") in October 2000 for violations of various NASD rules, including impeding an NASD investigation.

14. **Fidler**, age 70, resides in Lutz, Florida. He is an attorney licensed to practice in New York and New Jersey, and an inactive member of the District of Columbia bar. Fidler served as counsel to DOLV in its reverse merger in late 2016 and in several matters in 2017 and 2018. Fidler was indicted by the U.S. Attorney's Office for the Southern District of New York in 2000 for conspiracy related to a securities fraud and acquitted following trial.

15. **Boucher**, age 70, resides in Tucson, Arizona, and Epping, New Hampshire. Boucher purportedly engages in various business ventures and invests in microcap issuers. Boucher formerly held Series 4, 7, 24, 53, and 63 licenses through approximately 1990, when his firm, Boucher, Oehmke & Company was expelled by the NASD for various violations, including the sale of unregistered securities and making material misrepresentations to investors. Boucher was also charged in the 1990s by Arizona securities regulators for the sale of unregistered securities.

16. **Oravec**, age 52, resides in Greenwich, Connecticut, and in New York, New York. He is the owner of Pivo Assoc. Inc. ("Pivo"). Oravec, through Pivo, has served as the investor-relations contact for several microcap issuers, including DOLV. Oravec previously held Series 3, 7, 63, and 65 licenses.

17. **Bradley Fidler**, age 39, is Fidler's son and resides in Carolina, Puerto Rico.

18. **Jordan**, age 76, resides in River Ridge, Louisiana. He owns and operates WBC among several distressed financial entities he acquired and now holds in his own or his wife's

name. Jordan worked in various capacities in the financial industry since the 1970s, including as

a registered investment adviser. Jordan formerly held Series 1, 7, and 63 licenses.

19.    **WBC** is a corporation organized under the laws of Delaware in 1987 and based in

River Ridge, Louisiana. It is wholly owned and operated by Jordan as his nominee.

## OTHER RELEVANT ENTITIES

20.    **DOLV**, formerly known as Dolat Ventures, Inc., is a company domiciled in

Wyoming, with headquarters in Beijing, China, following its reverse merger with JB&ZJMY

Holding Company, Inc.[1] It purported to manufacture electric-car batteries as well as an electric

vehicle. DOLV last posted unaudited financial statements on OTC Markets on May 30, 2018.

DeQun Wang became the Chief Executive Officer of the company in December 2016 following

its reverse merger.

21.    **Pivo** is a corporation organized under the laws of New York, with offices in New

York City. Oravec wholly owns and operates Pivo, which purports to provide "Capital Markets"

services. Pivo has served as the investor-relations contact for microcap issuers, including DOLV.

## STATUTORY AND LEGAL FRAMEWORK

22.    Congress enacted the Securities Act to regulate the offer and sale of securities. In

contrast to the ordinary commercial principles of caveat emptor, Congress enacted a regime of

full and fair disclosure that requires a company (an issuer) and its control persons who offer and

sell securities to the investing public to provide sufficient, accurate information to allow

investors to make informed decisions before they invest.

23.    When an issuer of securities like DOLV, and its control persons and affiliates like

Thurlow, Fidler, and Oravec, offer and sell securities to the public, Sections 5(a) and (c) of the

---

[1]    For ease of reference, this Complaint will use DOLV to describe the company because that was the name of the entity during most of the relevant period.

Securities Act require that the issuer register those offers and sales of those securities with the Commission absent certain exemptions that do not apply to the Defendants' transactions. Registration statements relating to an offering of securities provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use the offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

24.     Section 5 of the Securities Act prohibits any unregistered securities offering. Through exemption provisions like Section 4 of the Securities Act [15 U.S.C. § 77d], however, Congress distinguished between (1) sales by issuers of their securities into public markets, which require registration, and (2) ordinary trading transactions in the market by investors once the securities have come to rest with them, which typically are exempt from registration.

25.     Congress sought to provide the protections afforded by registration both where securities are sold directly to the public by the issuer and where they are publicly sold through an intermediary who buys stock from the issuer with a view toward public resale, i.e., "underwriters." 15 U.S.C. § 77b(a)(11). Congress enacted a broad definition of underwriter to include all persons who might operate as conduits for securities being sold to the public.

26.     An issuer's sales of securities may be exempt from registration where they are not part of a public offering. Securities distributions, or public offerings, by issuers, with or without the use of underwriters, are not exempt from registration and must be registered under Section 5. Exemptions and safe harbors from registration are structured to exempt transactions where the purpose and protections of registration have been otherwise satisfied. The party claiming an exemption bears the burden of demonstrating that the transaction was entitled to one.

27. For example, Rule 144 of the Securities Act [17 C.F.R. § 230.144] sets forth several "safe harbors" pursuant to which a seller will be deemed not to be engaged in a distribution of securities and therefore not an underwriter. Rule 144(i), however, provides that the Rule 144 safe harbor will not be available for any issuer—like DOLV—that has, or at any previous time had, no or nominal operations and either (i) no or nominal assets, (ii) assets consisting solely of cash or cash equivalents; or (iii) assets consisting of any amount of cash or cash equivalents and nominal other assets.

28. After an issuer registers the offer and sale of its securities under the Securities Act, the Exchange Act requires it to make periodic and current public disclosures, including the annual, quarterly, and current reports that provide similar disclosures, including a description of the issuer's business, management's discussion and analysis, disclosure of significant events, and financial information. These filings are necessary to achieve the statutory goal of enabling investors in the offering, as well as would-be purchasers in secondary transactions, to make informed decisions.

## FACTS

**A.** **Background on DOLV and the Reverse Merger**

29. On December 29, 2015, an associate of DOLV's former controlling shareholder (the "Nominal Director") became the sole officer, director, and president of DOLV. At the time, DOLV, formerly a purported mining business with interests in Sierra Leone, stated it was changing its business to own and operate rental properties in the United States.

30. In or about August 2016, Fidler and Thurlow learned that DOLV was available for sale.

31.     At or around this time, Oravec learned from a finder in China that DeQun Wang—a Chinese national who purportedly owned a company that manufactured electric cars and batteries—was looking to publicly list his company, JB&ZJMY Holding Company, Ltd. ("JBZY"), in the United States. One manner of becoming publicly listed is through a reverse merger with an already publicly listed company such as DOLV.

32.     Oravec contacted Thurlow, a long-time acquaintance, who informed Oravec that he had companies, including DOLV, available for purchase. Oravec presented DOLV to Wang, who agreed to acquire control of the company.

33.     Thurlow, Fidler, and Oravec negotiated and structured the reverse merger transaction by which JBZY would be acquired by DOLV.

*(i)     Thurlow and Oravec Structure the DOLV Sale to Enable the Issuance of Shares*

34.     In the course of reviewing DOLV's corporate records in connection with the reverse merger, Thurlow and Oravec discovered that DOLV purportedly owed its former accounting firm ("Accounting Firm") $14,115 for services rendered in or about 2013.

35.     Oravec contacted the Accounting Firm's owner ("Accountant") after discovering the unpaid debt in the fall of 2016. Oravec and the Accountant agreed that DOLV would issue a convertible note—i.e., a note convertible to shares of DOLV—evidencing the $14,115 debt (the "Accounting Note") and that the Accountant would sell the Accounting Note as part of the reverse merger for $4,000.

36.     Oravec and Thurlow arranged for a Chinese translator ("Translator") to purchase the Accounting Note from the Accountant.

37.     Thurlow drafted the Accounting Note in fall 2016, but dated the note October 13, 2015. The note was convertible to shares of DOLV at a rate of $0.0001 per share (for a total of 141,150,000 shares).

10

38.     Oravec obtained the Accountant's signature on the falsely dated note in or around December 2016. The Nominal Director's signature was placed on the note at or around the same time by one or all of Fidler, Thurlow, or Oravec despite the fact that the Nominal Director did not become an officer of DOLV until more than two months *after* the purported date of the note.

39.     Nothing on the face of the Accounting Note indicated that it was executed in 2016, as opposed to the October 13, 2015 date appearing on the note.

40.     The DOLV reverse merger closed on December 2, 2016. The total sale price was $110,000, purportedly paid by Wang. Of that amount, Oravec and Thurlow received and split $31,811.25; Fidler's law firm received $17,500; and $4,000 was paid to the Accountant.

41.     Following the December 2016 closing, Thurlow, Fidler, and Oravec worked to bring DOLV's listing to "current" status on OTC Markets, the platform on which DOLV's shares traded. Once the listing was current, OTC Markets would remove the cautionary legend associated with DOLV's ticker on OTC Markets, which would increase the investing public's interest in purchasing DOLV's shares. To bring the listing current, Thurlow, Fidler, and Oravec arranged for the drafting and filing of unaudited financial statements.

**B.     The 2017 DOLV Issuances**

42.     In February 2017, Boucher and Jordan, both long-time acquaintances of Thurlow, purportedly approached Thurlow separately to purchase convertible debt in DOLV. Thurlow arranged for Boucher and WBC (Jordan's company) to purchase the DOLV debt, convert the debt, deposit the shares at a brokerage firm, and sell them in a series of transactions. Boucher subsequently purchased, converted, and sold DOLV debt and shares in three additional series of transactions, as outlined in the Table 1 below.

43.     Fidler's son, Bradley Fidler, also purchased, converted, and sold DOLV debt and shares as outlined in Table 1.

11

**Table 1: DOLV Conversions and Sales by Defendants**

| Conversion Date | Seller | Amount of Debt | Purchase Price | Shares Converted | Shares Sold[2] | Proceeds |
|---|---|---|---|---|---|---|
| 2/22/2017 | Boucher | $2,600 | $2,600 | 26,000,000 | 25,999,900 | $267,124.71 |
| 2/22/2017 | WBC | $2,600 | $2,600 | 26,000,000 | 25,999,254 | $1,274,704.11 |
| 4/10/2017 | Boucher | $2,600 | $2,600 | 26,000,000 | 25,798,661 | $969,566.60 |
| 5/25/2017 | Boucher | $1,250 | $20,000 | 12,500,000 | 12,700,439 | $781,044.64 |
| 7/16/2017 | Bradley Fidler | $700 | $1,250 | 7,000,000 | 7,000,000 | $541,550.57 |
| 7/26/2017 | Boucher | $3,650 | $40,000 | 36,500,000 | 36,501,000 | $1,866,650.47 |
| 10/31/2017 | Bradley Fidler | $1,200 | $50,000 | 12,000,000 | Unknown | ~$207,308.58 |

*(i)      March-April 2017 Boucher Conversion and Sale*

44.      The March-April Boucher transaction is typical of the pattern employed in the scheme. First, Boucher purchased $2,600 of DOLV debt from the Accounting Note, purportedly from the Translator, although Boucher paid the $2,600 purchase price to Oravec at the Translator's direction. Oravec and the Translator agreed that Oravec would use the payments to advance DOLV's interests in the United States, including bringing DOLV's OTC Markets listing up-to-date. The debt-transfer documents were prepared by Thurlow.

45.      Boucher converted the $2,600 of debt to 26 million shares. The share conversion documents were also prepared by Thurlow.

46.      Thurlow and Oravec arranged for Boucher to obtain an opinion letter from a Las Vegas attorney ("Las Vegas Attorney") for DOLV's transfer agent ("Transfer Agent 1") that the DOLV share issuance and contemplated sale did not violate Section 5 of the Securities Act.

---

[2]      "Shares Sold" is the total of shares sold between the date of conversion and the following conversion. To the extent that not all shares were sold prior to the following conversion, the sum may include shares from prior conversions and accordingly may exceed the most recent conversion sum.

47.     Oravec paid the Las Vegas Attorney's fee despite the fact that Boucher was the purported client.

48.     At Thurlow's direction, Oravec forwarded the debt purchase/assignment documents, including the falsely-dated Accounting Note, to the Las Vegas Attorney to support the opinion letters. Oravec and Thurlow knew, recklessly disregarded, or had reason to know that sending the Accounting Note while omitting the fact that it was executed in 2016 was materially misleading because the Accounting Note was falsely dated and the signatures had been obtained or placed on the note in 2016.

49.     In his transmittal email, Oravec informed the Las Vegas Attorney that the Accounting Note was "the original acquired Debt from 2015." Oravec knew, recklessly disregarded, or had reason to know that this representation was false or materially misleading because he had obtained the signature from the Accountant in 2016.

50.     The Las Vegas Attorney issued a letter dated March 23, 2017, to Transfer Agent 1 opining that Boucher was deemed to be the holder of the DOLV shares for at least 12 months pursuant to Rule 144(d)(1)(ii). In fact, because the Accounting Note was only approximately four months old, Boucher did not comply with the requirements of Rule 144(d)(1)(ii).

51.     In addition, the Las Vegas Attorney opined that DOLV was not a shell company. In fact, DOLV was a shell company because it had no or nominal operations and no assets as described above.

52.     Oravec and Thurlow coordinated directly with Boucher and Transfer Agent 1 to arrange for the issuance of the DOLV shares to Boucher's broker (the "Broker").

53.     The Broker would not accept the transfer of Boucher's DOLV shares or remove internal restrictions it placed on the trading of such shares in order to ensure compliance with

Section 5 of the Securities Act without an opinion letter from an attorney that met the Broker's internal criteria—i.e., a law firm listed on the American Lawyer's "AmLaw 200" list or from a top regional law firm with expertise in securities law. The Broker had this requirement for each of the deposits and sales of DOLV shares described in this Complaint.

54.    On or about March 23, 2017, Oravec contacted Charles Parkinson Lloyd ("Lloyd"), a lawyer at a Salt Lake City law firm, to issue an opinion letter to the Broker. Oravec forwarded the debt purchase and assignment documents, including the falsely dated Accounting Note and the Las Vegas attorney's letter, to Lloyd. Oravec knew, recklessly disregarded, or had reason to know that sending the Accounting Note to the attorney was materially misleading because it was falsely dated.

55.    Lloyd drafted a representation letter for Boucher's review and execution. Among the representations in the letter were that DOLV had not been a shell issuer for the prior 12 months and that Boucher "will not undertake any re-sale of the [DOLV] shares in concert with any other persons." Although Boucher knew, recklessly disregarded, or had reason to know that these representations were materially misleading because DOLV was a shell issuer and that he was acting in concert with Thurlow and Oravec, Boucher executed the representation letter.

56.    Lloyd issued an opinion letter dated March 24, 2017, to the Broker expressly stating that it was based "on representations and warranties" made to him and listing documents including the falsely dated Accounting Note. In his letter, Lloyd opined that Boucher's DOLV shares were "freely tradable; and that there was no restriction on the open market sale" of the shares.

14

57.     Relying on Lloyd's opinion—itself predicated on Boucher's false representations and the backdated Accounting Note—the Broker accepted the deposit of shares and removed its internal restrictions on the sale of the DOLV shares.

58.     Between March 29 and 31, 2017, Boucher sold 25,999,900 DOLV shares for proceeds of approximately $267,125.

*(ii)     The March-April Western Bankers Capital Conversion and Sale*

59.     Essentially contemporaneously to Boucher's first conversion and sale, Thurlow and Oravec orchestrated a conversion and sale of DOLV shares by Jordan through his nominee entity, WBC.

60.     After Thurlow alerted Jordan to the availability of DOLV convertible debt, Jordan emailed Oravec to inquire about "aged debt." Oravec and Thurlow knew, recklessly disregarded, or had reason to know that the DOLV convertible debt—and the shares to be issued as a result— was not properly "aged" because they had generated the Accounting Note and obtained the signatures on it within the previous four months.

61.     As with the first Boucher conversion and sale, Thurlow and Oravec arranged for the Las Vegas Attorney to issue an opinion letter, for which Oravec paid, to Transfer Agent 1.

62.     Following the issuance of the Las Vegas Attorney's letter, Thurlow and Fidler arranged for Lloyd to issue an opinion letter to the Broker concerning Jordan/WBC's shares. The opinion letter was necessary for the Broker to accept the DOLV shares and to remove internal restrictions on the trading of such shares.

63.     Thurlow asked to Lloyd to provide him a copy of the engagement letter between Lloyd and Jordan/WBC.

64.     In connection with obtaining the opinion letter from Lloyd, Jordan executed a representation letter dated April 3, 2017, drafted by Lloyd, in substantially the same form as Boucher's March 2017 representation letter.

65.     On April 4, 2017, Lloyd issued an opinion letter to the Broker in substantially the same form as the letter he issued for the first Boucher transaction. The Broker removed the internal restrictions on the sale of the DOLV shares as a result.

66.     Between April 6, 2017, and May 15, 2017, Jordan/WBC sold 25,999,254 DOLV shares for total proceeds of approximately $1,274,704.

(iii)     *Thurlow, Oravec, and Fidler Issue a Press Release on Behalf of DOLV*

67.     In addition to the efforts of Thurlow, Oravec, and Fidler to update DOLV's OTC Markets' listing described above, Thurlow, Fidler, and Oravec undertook other efforts on behalf of DOLV to advance the company's interests in the United States and to increase the investing public's interest in DOLV.

68.     On April 7, 2017, Oravec posted a "press release," drafted by Thurlow and Fidler, announcing the December 2016 reverse merger of DOLV with JB&ZJMY Holding Company, Ltd.

69.     Following the posting of the press release, the price of DOLV shares increased from a close of $0.0325 per share on April 7, 2017, to a close of $.0621 on April 10, 2017, the next trading day.

(iv)     *The April-May 2017 Boucher Conversion and Sale*

70.     Boucher bought, converted, and sold another tranche of DOLV debt in April and May 2017. By check dated April 10, 2017, Boucher paid Pivo $2,600 for the debt (despite that it was nominally owned by the Translator and convertible into 26 million shares worth in excess of $1.2 million).

71.     On April 17, 2017, Oravec emailed the Las Vegas Attorney to obtain another opinion letter for Boucher for DOLV's transfer agent.

72.     Oravec emailed the Las Vegas Attorney a package of the same debt purchase, assignment, and conversion documents underlying the March opinion letters (including the falsely dated note) with one difference—the dates had been manipulated to April dates. In other words, Oravec, Thurlow, and Boucher simply pasted new dates on top of the earlier ones (in a different font):

| March Signature Block | April Signature Block |
| --- | --- |
| Dolat Ventures, Inc. By: Name: Wang Dequn Title: PRESIDENT Effective Date: February 22, 2017 | Dolat Ventures, Inc. By: Name: Wang Dequn Title: PRESIDENT Effective Date: April 10, 2017 |

73.     Oravec, Thurlow, and Boucher knew, recklessly disregarded, or had reason to know that manipulating the date would give the false appearance that the April purchase, assignment, and conversion documents had been signed by Wang in connection with the April purchase and conversion.

74.     The Las Vegas Attorney issued a new opinion letter to Transfer Agent 1 on April 17, 2017, in an identical form to his March opinion letter.

75.     In connection with obtaining an opinion letter for the Broker so that it would remove the internal restrictions on the sale of the DOLV shares, Boucher executed another representation letter to Lloyd that, among other things, referred to the April 17, 2017 Las Vegas Attorney opinion letter and falsely stated that Boucher "will not undertake any re-sale of the

Shares in concert with any other persons," that DOLV was not a shell company, and that the transaction was "not part of a scheme to evade the 1933 Act registration requirements."

76.    Boucher knew, recklessly disregarded, or had reason to know that these representations were materially misleading, particularly given his prior experience in the securities industry and his previous transaction in DOLV debt and shares, which were being coordinated with at least Thurlow and Oravec.

77.    Lloyd issued an opinion letter to the Broker on April 27, 2017, in the same form as his prior opinion letter for Boucher.

78.    Following the receipt of Lloyd's opinion letter—which relied on Boucher's false representations and the manipulated debt assignment and conversion agreements—the Broker removed its internal restrictions on the sale of the DOLV shares.

79.    Between May 1 and May 30, 2017, Boucher sold 25,798,661 DOLV shares for proceeds of approximately $969,567.

*(v)    Later Boucher Conversions and Sales*

80.    On May 25, 2017, Boucher purchased $1,250 of convertible DOLV debt (from the Accounting Note) for $20,000, which was paid to Oravec through Pivo despite that the debt was ostensibly owned by the Translator.

81.    At the time, the debt was convertible into 12.5 million DOLV shares worth approximately $1 million.

82.    Boucher obtained opinion letters stating that the shares could be sold without restriction—essentially identical to the prior opinion letters—from the Las Vegas Attorney for Transfer Agent 1 dated June 1, 2017, and from Lloyd dated June 12, 2017, for the Broker, where he deposited the shares.

83. Boucher again executed a representation letter, dated June 2, 2017, for Lloyd falsely representing that he "will not undertake any re-sale of the Shares in concert with any other persons," that DOLV was not a shell company, and that the transaction was "not part of a scheme to evade the 1933 Act registration requirements."

84. Boucher knew, recklessly disregarded, or had reason to know that these representations were materially misleading, particularly given his prior experience in the securities industry and trading microcap securities and his previous transactions in DOLV debt and shares, which were being coordinated with at least Thurlow and Oravec.

85. Boucher sold those shares (as well as some additional shares from the prior issuances) totaling 12,700,439 shares between June 8 and July 20, 2017, for proceeds of approximately $781,045.

86. On July 26, 2017, Boucher acquired an additional $3,650 of the debt from the Accounting Note for a purchase price of $40,000. This sum was again paid to Pivo, benefitting Oravec, despite that the debt was ostensibly owned by the Translator and that the debt was convertible into 36.5 million shares worth approximately $2.09 million on July 26, 2017.

87. Boucher again obtained opinion letters from the Las Vegas Attorney to Transfer Agent 1, dated August 2, 2017, and from Lloyd to the Broker, dated August 15, 2017, stating that the shares could be sold without restriction.

88. In connection with obtaining the opinion letter from Lloyd, Boucher once again executed a false representation letter, dated August 12, 2017, stating that he "will not undertake any re-sale of the Shares in concert with any other persons," that DOLV was not a shell company, and that the transaction was "not part of a scheme to evade the 1933 Act registration requirements."

19

89.     Boucher knew, recklessly disregarded, or had reason to know that these representations were materially misleading, particularly given his prior experience in the securities industry and trading microcap securities and his previous transactions in DOLV debt and shares, which were being coordinated with at least Thurlow and Oravec.

90.     Boucher deposited the shares at the Broker, which relied on Lloyd's letter to remove its internal restrictions on the sale of the DOLV shares.

91.     Boucher sold 35,501,000 shares between August 21 and November 3, 2017, for proceeds of approximately $1,866,650.

92.     In total among all of his conversions and sales, Boucher sold 101,000,000 shares for proceeds of approximately $3.88 million.

*(vi)     The Proceeds of the Boucher DOLV Transactions*

93.     Boucher funneled significant portions of his $3.88 million in proceeds from his DOLV sales back to Thurlow and Fidler through various transactions.

94.     In November and December 2017, Boucher paid $750,000 to two overseas entities related to Fidler and/or Thurlow, purportedly to advance business interests of Boucher in the United Kingdom. But no work was performed on the purported projects. Boucher never sought repayment of the sums despite the lack of work performed.

95.     To further benefit Thurlow, Boucher paid approximately $93,760 to an entity that Thurlow controlled. Boucher also paid approximately $66,000 directly to Thurlow and his wife in purported loans and/or investments that were never repaid.

96.     In addition, Boucher paid Fidler $50,000 for purported legal services.

97.     Oravec also paid Fidler $59,875 for legal services related to DOLV from the proceeds of the DOLV debt sales assigned to him by the Translator. Further, Oravec paid $50,000 to Thurlow's company and sent additional sums to Thurlow's wife to benefit Thurlow.

C.     **Bradley Fidler Share Issuances**

(i)     *The July 2017 Bradley Fidler Debt Conversion and Sale*

98.     In May 2017, Fidler and Thurlow discovered that DOLV owed a balance of $700

to its former transfer agent ("Transfer Agent 2") for services provided in or about 2012, plus a

$500 "balance forward fee." Thurlow arranged for Jordan/WBC to purchase the outstanding

receivable from Transfer Agent 2 by paying the balance owed to Transfer Agent 2.

99.     Thurlow then drafted, in identical forms to those related to the Accounting Note

he drafted in 2016, corporate resolutions making the Transfer Agent 2 debt convertible into

7,000,000 DOLV shares at $0.0001 per share (despite that DOLV shares traded at $0.062 on July

13, 2017). In other words, Thurlow arranged for DOLV to issue shares worth approximately

$434,000 at the time in satisfaction of a $1,200 debt.

100.     Jordan then sold the convertible debt to Bradley Fidler for $1,250 that Fidler paid

for from his firm's business account. Fidler apparently paid for the debt as a "favor" to his son.

101.     The debt assignment, transfer, and conversion documents—drafted by Thurlow—

all purport to include the signature of DOLV's president, Wang. But none of Wang's signatures

match the signatures that appear on the prior versions of the DOLV documents executed in

connection with the December 2016 reverse merger or the March and April 2017 Boucher and

WBC/Jordan transactions. Features readily distinct between the two signatures include: (i)

"Wang" was written in print in February and in cursive in July; (ii) the shape of the "g" at the

end of "Wang"; (iii) the "D" and "e" were separate in "Dequn" in February but connected in

July; and (iv) the "q" in "Dequn" was not capitalized in February but was capitalized in July:

| February Wang Signatures | July Wang Signatures |
|---|---|
| Dolat Ventures, Inc.<br>By: *[signature]*<br>Name: Wang Dequn<br>Title: PRESIDENT<br>Effective Date: February 22, 2017<br><br>Very truly yours,<br>By: *[signature]*<br>Name: Wang Dequn<br>Title: CEO, PRESIDENT | Dolat Ventures, Inc.<br>By: *[signature]*<br>Name: Wang Dequn<br>Title: PRESIDENT<br>Effective Date: 13 July, 2017<br><br>Very truly yours,<br>By: *[signature]*<br>Name: Wang Dequn<br>Title: CEO, PRESIDENT |

102.    Fidler contacted the Las Vegas Attorney and Lloyd to issue opinion letters on behalf of Bradley Fidler to Transfer Agent 1 and the Broker, respectively.

103.    Despite the fact that documents provided to the Las Vegas Attorney demonstrated that the invoices had been recently purchased by WBC and made convertible the day prior, the Las Vegas Attorney issued an opinion letter to Transfer Agent 1 on July 14, 2017, opining that the securities had been "acquired" in 2012.

104.    None of Fidler, Thurlow, or Bradley Fidler could reasonably believe that the securities were "acquired" in 2012 because all of the documentation underlying the transaction indicated that the debt was acquired and the securities were issued in July 2017.

105.    Nevertheless, Fidler and Bradley Fidler provided the Las Vegas Attorney's opinion to Lloyd in connection with obtaining an opinion letter from him for the Broker. Fidler and Bradley Fidler knew, recklessly disregarded, or had reason to know that providing the Las Vegas Attorney's letter to Transfer Agent 1 and Lloyd was materially misleading as to the date of issuance of the securities.

22

106.    In addition, Bradley Fidler executed a representation letter to Lloyd, dated August 2, 2017, replete with false representations, including: (i) that the underlying debt was related to the Accountant's debt purchased by WBC in February 2017 (when in fact the debt had originated with Transfer Agent 2); (ii) concerning the contents of the Las Vegas Attorney's opinion letter; (iii) that Bradley Fidler would not undertake the re-sale of shares in concert with any other person; and (iv) that Bradley Fidler had no relationship with DOLV (despite the fact that his father acted as counsel to the company).

107.    Bradley Fidler knew, recklessly disregarded, or had reason to know that these representations were false given the dates of the debt conversions that he signed, that his convertible debt purchase was financed by his father, DOLV's attorney, and the differences between the Las Vegas Attorney's opinion letter and the description of its contents in the representation letter.

108.    Lloyd issued an opinion letter to the Broker on August 3, 2017, stating that the deposit and sale of DOLV shares would not violate federal law. Following the receipt of the opinion letter, the Broker removed its internal restrictions on the sale of the shares.

109.    Bradley Fidler sold all of the shares between August 8, 2017, and September 7, 2017, for proceeds of approximately $541,551.

*(ii)    The November 2017 Bradley Fidler Conversion*

110.    Pursuant to an agreement dated October 31, 2017, Bradley Fidler purchased a $1,200 tranche of debt from the Accounting Note from the Translator. Bradley Fidler paid $50,000 to Oravec's company, Pivo, for the shares despite the fact that it was convertible to 12 million shares worth approximately $720,000 on that date.

111.    Bradley Fidler obtained an opinion letter, dated November 1, 2017, from the Las Vegas Attorney to Transfer Agent 1 and sought an opinion letter from Lloyd for the Broker.

112.     In connection with obtaining an opinion from Lloyd, Bradley Fidler executed another representation letter, dated November 6, 2017, containing the following misrepresentations: (i) that Bradley Fidler would not undertake the re-sale of shares in concert with any other person (when in fact he was acting in concert with at least his father and Oravec); and (ii) that Bradley Fidler had no relationship with DOLV (despite that his father was DOLV's attorney).

113.     Bradley Fidler knew, recklessly disregarded, or had reason to know that these representations were false given that he was purchasing the debt at a significant discount to the market value of the shares to which it could be converted, the documents that he signed indicated that the proceeds of the debt sale were being provided to Oravec, his father was DOLV's attorney, and he later funneled the proceeds of his sales back to his Fidler.

114.     Despite the opinion letter from Lloyd, dated November 8, 2017, the Broker would not remove its internal restrictions on the sale of the DOLV shares. As a result, Bradley Fidler transferred the shares from the Broker back to Transfer Agent 1.

115.     Thurlow arranged for Bradley Fidler to sell the shares through a European firm, which then deposited approximately $207,309 from the sale of the shares to Thurlow's bank account in the United Kingdom on January 22, 2018.

116.     The next day, Thurlow transferred the proceeds (minus 2000 GBP) to an account controlled by Fidler in the United States.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (All Defendants)

117.     The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 116, as though fully set forth herein.

118.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use or medium of any prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of any prospectus of otherwise, securities as to which no registration statement had been filed.

119.     Accordingly, Defendants, directly or indirectly, violated, and, unless restrained and enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Defendants Thurlow, Oravec, Boucher, and Bradley Fidler)

120.     The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 116, as though fully set forth herein.

121.     By engaging in the conduct described above, Defendants Thurlow, Oravec, Boucher, and Bradley Fidler, with scienter, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or one or more omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

122.     By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendants Thurlow, Oravec, Boucher, and Bradley Fidler have violated, and,

unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Defendants Thurlow, Oravec, Boucher, and Bradley Fidler)

123.    The Commission repeats, realleges, and incorporates by reference paragraphs 1

through 116, as though fully set forth herein.

124.    By engaging in the conduct described above, Defendants Thurlow, Oravec,

Boucher, and Bradley Fidler, with scienter, directly or indirectly, by use of the means or

instruments of transportation or communication in interstate commerce, or of the mails, in

connection with the offer or sale of securities: (a) employed devices, schemes and artifices to

defraud; (b) obtained money or property by means of untrue statements of material fact, or

omitted to state material facts necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaged in transactions,

acts, practices and courses of business which would operate as a fraud or deceit upon the

purchaser.

125.    By reason of the acts, omissions, practices, and courses of business set forth in

this Complaint, Defendants Thurlow, Oravec, Boucher, and Bradley Fidler have violated, and,

unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Defendant Fidler)

126.    The Commission repeats, realleges, and incorporates by reference paragraphs 1

through 116, as though fully set forth herein.

127. By engaging in the conduct described above, Defendant Fidler, with scienter, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, has: (a) employed devices, schemes or artifices to defraud; and (b) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

128. By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendant Fidler has violated, and, unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)].

## FIFTH CLAIM FOR RELIEF

### Violations of Sections 17(a)(1) and (a)(3) of the Securities Act
### (Defendant Fidler)

129. The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 116, as though fully set forth herein.

130. By engaging in the conduct described above, Defendant Fidler, with scienter, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the offer or sale of securities: (a) employed devices, schemes and artifices to defraud; and (b) engaged in transactions, acts, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

131. By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendant Fidler has violated, and, unless restrained and enjoined, will continue to violate, Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (a)(3)].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting
### (Defendants Thurlow, Boucher, Fidler, Bradley Fidler, and Oravec)

132.     The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 131, as though fully set forth herein.

133.     As alleged above, Thurlow, Boucher, Bradley Fidler, and Oravec violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5].

134.     As alleged above, Fidler violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)].

135.     Thurlow, Boucher, Fidler, Bradley Fidler, and Oravec knowingly or recklessly provided substantial assistance to each other with respect to their violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)], and to Thurlow's, Boucher's, Bradley Fidler's, and Oravec's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R.§§ 240.10b-5(b)].

136.     By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. §77o(b)] and Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting each other's violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R.§§ 240.10b-5(a) and (c)], and to Thurlow's, Boucher's, Bradley Fidler's, and Oravec's violations of Section 17(a)(2) of the Securities Act

[15 U.S.C. § 77q(a)(2)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R.§§ 240.10b-5(b)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### **I.**

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, or aiding and abetting violations of, Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), (c); and 77q(a)] of the Securities Act; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

### **II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and (d)(7);

### **III.**

Ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently barring Defendants from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)]; and

**V.**

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
      September 15, 2021

SECURITIES AND EXCHANGE COMMISSION

By:   RICHARD BEST   Digitally signed by RICHARD BEST
                              Date: 2021.09.15 09:24:28 -04'00'

Richard R. Best
Lara Shalov Mehraban
Sheldon L. Pollock
Victor Suthammanont
Ladan F. Stewart
Mary Kay Dunning
200 Vesey Street, Suite 400
New York, New York 1028
(212) 336-5674 (Suthammanont)
Email: SuthammanontV@sec.gov

Attorneys for Plaintiff

30