**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | **:** | |
| **COMMISSION,** | | |
| **Plaintiff,** | **:** | **Hon. Vernon S. Broderick** |
| **V.** | **:** | **Civil Action No. 21-CV-700(VSB)(CLW)** |
| **SIMON  PIERS  THURLOW, et al.** | **:** | **DEFENDANTS' 12(b)(6) MOTION TO DISMISS** |
| **Defendants** | **:** | |

_____

**MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ----------------------------------------------  **4**

II.   FACTS --------------------------------------------------------------------  **7**

III.  THE RULE 144 EXEMPTION ------------------------------------------  16

IV.   ARGUMENT AND AUTHORITY ---------------------------------------  17

    A.  THE COMPLAINT MUST BE DISMISSED BECAUSE----------  **17**
        IT FAILS TO STATE A CLAIM UPON WHICH
        RELIEF MAY BE GRANTED

        1.  Plaintiff has failed to state a claim that Defendant ----------  **20**
            manufactured a fraudulent Convertible Note
            violating Rule 5 and Rule 10b

        2.  Plaintiff has failed to state a claim that Dolat ----------------  **23**
            Ventures was a shell company, therefore the
            Rule 144 exemption to registration was available
            for sale of the Converted Shares

        3.  The Plaintiff has failed to a claim that Sellers of the--------  **26**
            Converted Shares were Affiliates of Dolat

        4.  Since the Dolat Note was actually ISSUED October 13, ---  **27**
            2015, it was held for over one year thereby
            satisfying both the one year and the six month
            Holding Period rendering the stock sales
            at issue Lawful

    B.  CONCLUSION ---------------------------------------------------------  **28**

**EXHIBITS**
**A-Complaint**
**B-Affidavit of Dr. Steven Stein**
**C-Email between Dr. Stein and Roger Fidler**
**D-Affidavit of Anying Huang**
**E-Courier Receipts re Note Transfer**
**F-Ben Bunker Boucher Legal Opinion**
**G-Courier Receipts re Bradley Fidler Note Transfer**
**H-Convertible Instrument re Empire Stock Debt**
**I-Affidavit of Brinsley Holman**
**J-2015 Quarterly Report of Dolat Ventures, Inc.**
**K-English Translation of Business Plan**
**L-March 31, 2017 Quarterly Report for Dolat Ventures, Inc.**
**M-Affidavit of Simon Thurlow**

TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 17, 18, 19, 20, 24

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) ................................................. 17, 18, 19

*DuraPharma., Inc. v. Brouda,* 544 U.S. 336 (2005) ........................................... 20

*Naglar v. Admiral Corp,* 248 F. 2d 319,324 (2 d. Cir. 1957) ......................... 18, 23

*Taylor v. Bear Stearns & Co.,* 572 F. Supp. 667 (N.D. Ga. 1983) ................. 17, 24

**STATUTES**

UCC   3-104 ................................................................................................................ 21

UCC   3-113 (a) .......................................................................................................... 21

UCC   3-113 (b) .......................................................................................................... 21

**RULES**

17 CFR   230.144 ...................................................................................................... 16

Rule 144 (i) ............................................................................................................... 16

Section 2 (a) (11) ...................................................................................................... 16

Fed. R. Civ. Proc. 12 (b) (6) .................................................................................... 17, 18

F.R. Civ Proc. 8 ........................................................................................................ 18

Rule 144 ..................................................................................................................... 23, 24

Section 5 of the Securities Act of 1933 .............................................................. 16, 24

Rule 144 (a) (1) ........................................................................................................ 26

Rule 144 (d) (1) ........................................................................................................ 27

Rule 144 (d) (1) (i) ................................................................................................... 27

# I. PRELIMINARY STATEMENT

This matter concerns allegations by the Securities and Exchange Commission (SEC")

against Roger Leon Fidler ("Fidler"), Simon Piers Thurlow ("Thurlow"), Richard Oravec

("Oravec"), Bryce Boucher ("Boucher"), Joseph Jordan ("Jordan"), Bradley Fidler and Western

Bankers Capital, Inc. ("WBC") ("Defendants") in an alleged fraudulent scheme to have millions

of Dolat Ventures, Inc. (hereafter also referred to as "Dolat") shares issued pursuant to an alleged

forged and backdated convertible note in the amount of $14,115.00, that supposedly facilitated

an alleged unlawful offering of unregistered shares of Dolat Ventures, Inc. ("Dolat"), between

March and December 2017 (hereafter referred to as the "Alleged Scheme").

The SEC claims that the Defendants worked in concert by converting debt of Dolat into

shares of the company and in turn selling or causing those shares to be sold to the public without

registering the transactions with the Commission, in violation of Section 5(a) and 5(c), and

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

thereunder, and aiding and abetting violations of other defendants of these statutes and rules.

The allegations of the SEC can be summarized as follows. The SEC claims that the

Defendants perpetrated a scheme to sell unregistered shares of stock by coordinating a reverse

merger, syphoning debt from the public company by backdating a convertible note representing

such debt, to obtain opinion letters in order to qualify the converted stock for the Rule 144

exemption to registration requirements, thereby rendering such stock as free trading to be sold on

the open market.

The SEC further alleges that the Defendants acted in concert with their cronies to

coordinate the selling of the converted stock, and that Mr. Thurlow was given a "kickback"

payment from one of these cronies who purchased some of the Dolat Debt.  However, the SEC

has all of Defendant Thurlow's bank statements and records, the Plaintiff cannot provide any

4

bank records or other evidence that substantiate that Defendant Thurlow received any of the funds related to the merger or the subsequent stock sales.  Thus, this allegation is yet another meritless allegation.

Despite extensive evidence to the contrary, the SEC claims that in October or November of 2016, upon discovery of Dolat's corporate files showing it to be a viable public company, the Defendants found aged debt in Dolat, drafted backdated convertible notes from such Debt in order to have millions of freely tradeable stock issued and sold pursuant to a coordinated plan and scheme.

A Plaintiff's complaint must contain sufficient factual detail to state a plausible claim for relief. A complaint has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The SEC had an obligation to provide the "grounds" of its "entitle[ment] to relief, by showing enough factual material provided in the complaint to support a reasonable inference that the defendants were responsible for the alleged harm. Instead, the SEC's Complaint is comprised merely of threadbare recitals of a cause of action's elements, pleading facts that are "merely consistent with" a defendant's liability and supported only by mere conclusory statements. However, the Defendants will show the Court prima facia evidence that the SEC's claims are merely baseless, unsubstantiated and meritless assertions.

## II.  <u>FACTS</u>

Dolat Ventures, Inc., was/is a company originally incorporated in Nevada and later domiciled in Wyoming.  Between April 2010 and December 30, 2015, Dolat Ventures, Inc., with its subsidiary, Millenium Mining, LLC. (hereafter referred to as "Millenium"), was in the business of mining and wholesale distribution of diamonds and precious gemstones.  However,

due to the severe Ebola outbreak in 2014, the company was forced to sell Millenium, and move the company in a different direction.

A purported filing by Steven Stein filed December 31, 2015 transferring Millenium was not in fact electronically signed by Dr. Stein, and the Millenium assets remained in Dolat until written off in 2017 after the acquisition of other assets. Dr. Stein was replaced by Dequn Wang and his battery/car business which remained in Dolat until at least 2018.

Between 2013 and 2015, Dolat had not paid its accountant DaParma d/b/a  Executive Support and Services Group Corp.  In order to satisfy this Debt, Dolat issued a Convertible Promissory Note in the amount of $14,115.00.   The Note was signed by Dr. Steven Stein who was the principal officer at the time.  Dr. Stein has authenticated the signature on the Dolat Note as his own, contrary to the SEC's assertions that the Defendants forged the Convertible Note sometime in the fall of 2016.  With the authority to bind the company.  Dr. Stein has submitted his affidavit in support of this Motion, in which he authenticates the signature on the Dolat Note as his own, contrary to the SEC's assertions that the Defendants forged the Convertible Note sometime in Nov of 2016.

In October of 2016, attorney Roger Fidler was hired by a client to assist him in certain ventures for one of his companies.  The client provided Mr. Fidler with his Company's corporate files in a large file box.  As Mr. Fidler and his chief clerk, Mr. Thurlow, reviewed the contents of the box, they realized that in addition to the corporate files of the Company that Mr. Fidler agreed to perform work for, there were corporate files of other companies, including the corporate files of Dolat Ventures, Inc., a publicly traded corporation.

At about the same time that Mr. Fidler had reviewed the records of Dolat, a friend of Mr. Thurlow's, Richard Oravec contacted the Fidler firm because he had a Chinese corporate client, JB&ZJMY Holding Co. ("JB&ZJMY") that was looking to become a publicly traded company

in the US, by acquiring a US public company via a reverse merger.  Since Mr. Fidler was a corporate securities attorney, Mr. Oravec knew that invariably securities attorneys became aware of public companies for sale, thus he inquired to see if Mr. Fidler was aware of a public company available to be purchased by JB&ZJMY.

JB&ZJMY was a Chinese company based in Beijing that manufactured electric car batteries and electric cars, and held several patents in battery and automobile transmission technology.  JB&ZJMY was looking for a US public company to purchase and complete a reverse merger actively seeking a US public company to purchase and complete a reverse merger with.  Mr. Fidler obtained permission from Dr. Stein, President of Dolat, to commence negotiations aimed at a possible merger with JB&ZJMY.  Mr. Oravec discussed with the President of his client JB&ZJMY, DeQun Wang ("Wang"), the possibility of completing a reverse merger with Dolat.  Mr. Wang agreed that Dolat would be a suitable merger candidate for JB&ZJMY and hired Mr. Fidler's firm to draft the paperwork, agreements and corporate filings necessary to complete the reverse merger.

At the time of the merger, JB&ZJMY had ongoing operations manufacturing proto-type electric-car batteries and electric cars, and owned patents for cars and batteries.  Consequently, at the time of the merger JB&ZJMY Holding Co. was an operating company with significant assets, not the least of which were the numerous patents it held.

While reviewing Dolat's corporate records, Mr. Thurlow, Mr. Fidler's law clerk, found debt instruments in the box that included a Convertible Promissory Note in the name of Edward DaParma ("DaParma") and his accounting firm, ESSG, representing the debt that Dolat incurred from ESSG for its accounting work performed for Dolat.

Contrary to the SEC's bare allegation that the Defendants drafted, backdated and forged the Dolat Note**,** the Note was signed, and therefore authorized by Dr. Stein, the principal officer

of Dolat, at the time the Note was created in October of 2015. **(See the Affidavit of Dr. Steven Stein attached hereto as Exhibit B and Affidavit of Simon Thurlow, Exhibit M)**. In an email communication on November 20, 2018, 3 years after the Note was executed, Dr. Stein stated that;

1. He only signed Dolat documents or papers sometime around November of 2015, the same time that the Note is purported to have been signed by Dr. Stein;
2. He stated that in signing the documents around November of 2015, he could have signed the signature page of the Note and not known it;
3. He has also authenticated and confirmed that it is in fact his signature on the signature page of the Note, which was signed sometime around October/November of 2015. *Id.*

In addition, Dr. Stein also signed a Dolat Board resolution in December of 2015, and he signed a stock certificate order form on February 3, 2016, affixing his signature 3 times. All of these signatures match the signature on The Note, which coincides with the date(s) he stated in the November 20, 2018 email to Mr. Fidler **(See email attached hereto as Exhibit C).**

In addition to drafting the necessary agreements, documents and filings to effectuate the reverse merger, it was also necessary to clean up the debt in the company. Mr. Wang's interpreter, Anying Huang, was willing to purchase the Dolat Note from Mr. DaParma. Mr. DaParma negotiated the sale price for the $14,115 note, which the parties agreed would be $4,000, roughly 30 percent of the Debt. Mr. Huang has submitted an affidavit **(a copy of which is attached hereto as Exhibit D)** stating:

> I was the purchaser for value for USD $4000 of a convertible debt
> instrument with a face value of $14,115 dated October 2015…formerly
> held by Executive Support Services a Dolat service provider.

Mr. Huang went on to state, "I am not now, nor have I ever been an affiliate or control person of Dolat Ventures or its successor the JB&ZJMY Holding Co.". The mail receipts for the documents being sent to Mr. Wang for his signature, care of Mr. Huang, and for the return parcel

containing the document with Mr. Wang's signature are attached hereto as Exhibit E.  At the time the Note was sold to Mr. Huang the stock price was $.0001 per share.

In February 2017, Bryce Boucher and Joseph Jordan, past clients of Roger Fidler and acquaintances of he and Mr. Thurlow, were aware of the Dolat Merger, and as individuals who both had worked in the securities industry inquired of Mr. Fidler and Mr. Thurlow whether there were any Debt instruments available for sale.  Upon being informed that Mr. Huang was looking to sell the Dolat Note, both Mr. Boucher and Mr. Jordan (through his company known as WBC) negotiated with Mr. Huang to purchase a percentage of the Dolat Debt.  The Debt purchase documents for both Boucher and WBC/Jordan, were drafted by the Fidler law firm, since they were clients of Mr. Fidler.

Since the Dolat Note had been held for over one year, both Mr. Boucher and Mr. Jordan were able to convert the Dolat Debt that each one had purchased, into free trading stock, because in addition to satisfying the year-long holding period requirement, they satisfied all the other requirements necessary to sell their converted shares pursuant to the Rule 144 exemption to registration.  Both Mr. Boucher and Mr. Jordan each obtained Legal Opinion letters in order to deposit the converted shares into their respective brokerage accounts.

In March 2016, Mr. Boucher purchased $2,600 of DOLV debt from the Dolat Note, from Mr. Huang.  Mr. Fidler's son, Bradley Fidler, also purchased some of the Dolat debt. At the time of the purchase, Mr. Fidler had begun the process of bringing Dolat into compliance by working toward having all of Dolat's delinquent financials drafted and uploaded to OTC Markets to satisfy the requirement to have current financial information and other disclosures of pertinent information, available to the public and prospective investors.  Thus, on behalf of his employer, Mr. Wang (the owner and chief officer of Dolat), Mr. Huang instructed Richard Oravec to keep the $2,600.00 purchase price paid by Mr. Boucher for the Debt, requesting that the money be

used to pay for some of the "clean up" work being performed to bring the Company into compliance, including the cost of hiring accountants to help draft and file the delinquent financials.

Mr. Boucher hired attorney Benjamin Bunker to provide him with a legal opinion letter to have the restriction removed from the converted stock under the Rule 144 exemption to registration, in order to deposit those shares into his brokerage account.   Mr. Bunker's legal opinion **(a copy of which is attached hereto as Exhibit F)** concluded as follows:

The Seller acquired the shares to be sold in a transaction not registered under the Act. These shares stem from a Promissory Note issued by the Company to Executive Support and Services Group, Corp. ("ESSG"), dated October 13, 2015 for $14,115.00.  On December 3, 2016…ESSG assigned the entire Debt to Anying Huang ("Huang").  On February 22, 2017, pursuant to a Debt Purchase and Assignment Agreement Huang assigned $2,600 of the debt to the Seller.

1. Seller is deemed to have owned the Shares to be issued since October 13, 2015, and thus has been beneficial owner for a period of at least twelve months per Rule 144(d)(1)(ii).

2. The Seller is not an affiliate nor a control shareholder of the Company. The converted shares may be issued without restriction; freely tradeable.

3. The Company is not now a shell company, nor has it been a shell company…It is this counsel's opinion that Rule 144(i) regarding unavailability of the exemption does not apply.

4.  The Seller is not acting in concert with any other entity or individual; and the Seller is not acting in concert with any other entity or individual ; and the Seller is not acting on behalf of the Company in an unlawful distribution of its common stock… (See, Legal Opinion of Benjamin Bunker attached hereto as Exhibit F).

Mr. Bunker's legal opinion concludes:

I am of the opinion that the issuance of and proposed sale of these shares will be exempt from registration requirements of the Act by reason of…the exemptions contained under Rule 144…No violation of law will occur because of the issuance and sale of these securities under Rule 144.  (See Opinion of Benjamin Bunker attached hereto as Exhibit F).

Thus, Mr. Bunker's legal opinion directly contradicts and refutes the SEC's claims

against both Mr. Thurlow, as well as all of the other Defendants.  Mr. Bunker concludes that; 1) the Dolat Note was issued on October 13, 2015;  2) Dolat Ventures was not a shell company;  3) that the securities had been held for at least one year; 4)  that the Rule 144 exemption to registration was available for the sale of the converted stock;   That neither Mr. Jordan nor anyone else (the other Defendants) acted in concert to perform an unlawful distribution of stock.

In April of 2017, the law firm Kirton McKonkie was hired by Mr. Jordan to issue another legal opinion regarding the sale of his converted stock.   McKonkie's opinion concluded exactly as Mr. Bunker's had, that the sale of the converted stock complied with all of the requirements of Rule 144, and thus the shares could be lawfully sold pursuant to the Rule 144 exemption to registration.

The legal opinions and conclusions of Mr. Bunker and McKonkie, concluding that the converted stock could be lawfully sold under the Rule 144 exemption to registration, and that the Dolat Note was issued October 13, 2015, it must be concluded that the converted stock was not sold in unauthorized, unregistered stock sales in violation of Rule 5 and 10b as the SEC alleges, but instead was sold lawfully under the Rule 144 exemption.  Consequently, Mr. Thurlow (nor any of the other Defendants) could not have violated Section 5 of the Act.

Throughout the Complaint the Plaintiff continuously makes meritless, unsubstantiated allegations that the Defendants, including Mr. Thurlow, provided false representations to the public and the SEC by stating that the Dolat Note was issued on October 13, 2015 and had therefore been held for over a year at the time it was sought to be converted to stock; alleging instead that the Dolat Note was fraudulently backdated and forged.  However, it is evident from the affidavits attached hereto, (especially Dr. Stein's affidavit), the financials, and the legal opinions that there is insurmountable evidence that the Dolat Note was in fact issued on October 13, 2015, directly refuting the SEC's meritless and unsubstantiated claims.  The fact of the

11

matter is, that, since the Dolat Note was issued on October 13, 2015 and Dolat Ventures was not a shell, the Dolat Note was held for at least 1 year, therefore the converted stock was lawfully sold and there was no Section 5 or Section 10b violations by Mr. Thurlow.

On April 7, 2017, Mr. Fidler caused a press release to be issued in compliance with the Company's duty to announce or notify the general public of its merger.  The merger itself was already public knowledge but did not relieve Dolat of its duty to announce the merger itself. Paragraph 68 of the Complaint states that the press release was issued on April 7, 2017, and paragraph 69 of the Complaint essentially accuses Mr. Thurlow and Mr. Fidler of using the press release to pump up the stock price.

The SEC's allegation that the purpose of the April 7, 2017 press release, announcing the merger of Dolat and JB&ZIMY, was to provide a "pump" or boost to the stock price and assertion that the stock price actually increased after the press release, is not only wholly without merit, but disingenuous.  First, the information contained in the press release, whereby the Company was announcing the merger, was already public information, thus highly unlikely that such knowledge already known to the general public would trigger a significant increase in the stock price.  Consequently, this is simply another unsubstantiated allegation by the SEC, which is not only completely meritless, but also lacks logic.

In April 2017, Mr. Boucher bought, converted, and sold another tranche of DOLV debt in April and May 2017. By check dated April 10, 2017, Boucher paid Pivo $2,600 for the debt as instructed by Mr. Huang.  Boucher obtained opinion letters stating that the shares could be sold without restriction dated June 1, 2017, and from Park Lloyd, dated June 12, 2017, for the Broker so that the converted shares could be deposited into his brokerage account.

On July 26, 2017, Boucher acquired an additional $3,650 of the debt from the

Dolat Note for a purchase price of $40,000. This sum was again paid to Pivo, at the behest of Mr. Wang through his translator Mr. Huang, to pay for additional accounting, legal and filing fees. Boucher again obtained opinion letters, stating that the shares could be sold without restriction, and the converted shares were deposited into his account.

During this time, Mr. Boucher also sought to construct an app he conceived for cell phones but lacked the computer skills to construct (hereafter the "App").  The App allowed a person to walk and still see ahead of them while looking down at their phone.  Essentially, the app split the phone screen in two; one half of the screen showed the surroundings ahead of the person as they walked, and the other half shows whatever the person is viewing on their phone. Mr. Boucher contacted Mr. Fidler to determine what needed to be done to start the project, and Mr. Fidler referred an app and web designer, Anna Balquiedra, to create the App.  Ms. Balquiedra put in a bid of $1,000,000  to obtain the App contract.  Ms. Balquiedra's bid was the lowest bid, thus she was awarded the App project.  The contract terms for the App project an initial payment of a nonrefundable $500,000.00.

The SEC investigated Ms. Balquiedra claiming that the App project was a rouse, and that she was merely a conduit or straw person to funnel money to Mr. Fidler and Mr. Thurlow.  The SEC claimed that no work was actually performed on the project and that the $500,000 was simply a payment from Boucher to Ms. Balquiedra to be funneled to either Mr. Fidler or Mr. Thurlow.  However, contrary to the SEC's meritless allegations that no work was performed and that Ms. Balquiedra was merely a straw person, extensive work was actually performed on the project, but had to be halted for several months due to the deteriorating health of both Mr. Boucher and his son who was dying of cancer.  (Mr. Boucher's son just recently passed away losing his fight with brain cancer).

In fact, the SEC served Ms. Balquiedra with a subpoena, demanding that she produce all of her bank statements and requiring her to sit for a deposition.  Contrary to the SEC's unsubstantiated and meritless claims, Ms. Balquiedra's bank statements accounted for every penny she had received and found no evidence that any money had been funneled to either Mr. Fidler or Mr. Thurlow.  In fact, the investigation of Ms. Balquiedra revealed no wrongdoing whatsoever showing that the SEC's allegations against her, Mr. Fidler and Mr. Thurlow, were completely without merit, and the investigation against her was terminated.

Similarly, the remaining allegations of the Complaint in this case, are equally meritless and must be dismissed as being insufficiently pled and failing to state a claim for relief against Mr. Thurlow and all other Defendants.  As was the case with the allegations against Ms. Balquiedra, the SEC's claims that Mr. Thurlow received kickbacks from Mr. Boucher and Mr. Jordan for the Debt they purchased, are completely unsubstantiated, without any facts to support them.  Mr. Thurlow produced all his bank statements to the SEC and there is absolutely no evidence that he received and retained any payments.

In fact, the SEC's claims that certain payments by Boucher to Mr. Thurlow from a separate project were secret kickbacks are again completely without merit, since Mr. Boucher filed and sent a Form 1099 identifying such payments for work performed.  They certainly weren't secret kickbacks where Mr. Thurlow was 1099'd and he paid all of the taxes for such compensation.  It would be the worst kept secret ever, where Mr. Boucher sent a 1099 to Mr. Thurlow, and Mr. Thurlow paid the taxes for such earnings. Consequently, all the SEC's allegations against Mr. Thurlow are wholly meritless and without any supporting facts or evidence, thus they must be dismissed for failure to state a claim for which relief can be granted.

In May 2017, as part of his contractual duty to Mr. Wang and Dolat to bring Dolat into compliance with applicable securities laws, it was discovered that DOLV owed a balance of

$1,200.00 to its former transfer agent.  Upon learning about this additional Debt, Mr. Jordan

offered to purchase it from the transfer agent by paying the balance owed, which he did.

Mr. Jordan then sold the convertible debt to Bradley Fidler for $1,250, that Fidler paid

from his firm's business account as a gift to his son.  The debt assignment, transfer, and

conversion documents for the Debt purchased by Brad Fidler (hereafter referred to as the "Brad

Fidler Assignment Documents"), were drafted by the Fidler law firm. The Brad Fidler

Assignment Documents were then sent via express mail to Mr. DeQun Wang in China for his

signature as the controlling shareholder and Chief Executive Officer of Dolat**.  (See the receipts

from the express mail pack to Mr. DeQun Wang attached as Exhibit G).**

The SEC claims that Mr. Wang's signatures on the Brad Fidler Assignment Documents

appear different from his previous signatures, thus, the SEC asserts that Mr. Wang's signature on

the Brad Fidler Debt Assignment, were forged[1] by one of the Defendants.  However, contrary to

this meritless claim, both Mr. Huang's sworn testimony and the express mail receipts disprove

the allegations that Mr. Wang's signature on the Brad Fidler documents.  It is illogical to think

that the Defendants would forge Mr. Wang's signature of the Brad Fidler Assignment

Documents, when at the same time that the SEC claims the documents were allegedly forged by

the Defendants, the Fidler firm sent express mail envelopes to Mr. Wang.  Again, Mr. Huang

testifies that those are his signatures on the Brad Fidler documents.  In addition, Mr. Huang

testifies that Mr. Wang's signature appears different depending on whether it is signed in English

or Chinese.  (See Huang Affidavit attached as Exhibit D)[2]

---

[1] The SEC's alleges that none of Wang's signatures match the signatures that appear on the prior versions of the Dolat documents executed in connection with the December 2016 reverse merger or the March and April 2017 Boucher and Jordan transactions.  (Complaint at Para. 101). This is controverted by Mr. Huang's affidavit (Ex. D). Mr. Huang is Chinese and doesn't speak or write much English.  It is not ascertainable how many different ways he would sign something in another language.

[2] The issues raised in paragraph 103-104 of the Complaint relate to the date the underlying liability was created.  See the attached Board Resolution creating the convertibility of the debt **(attached as Exhibit H)**.  Since the underlying

### III.     The Rule 144 Exemption

Pursuant to Section 5 of the Securities Act of 1933 (hereafter the "Securities Act"), the sale of securities must be registered with the SEC unless, the sale qualifies to one of the many exemptions to the registration requirement.  Securities that have not been registered under the Act are known as restricted securities, which cannot be resold to the public unless the sale of the securities qualifies for an exemption to registration.  One such exemption to registration is covered by 17 CFR § 230.144 (commonly known as "Rule 144").   Rule 144(i), however, provides that the Rule 144 safe harbor will not be available for any issuer that has nominal operations and nominal assets, known as a shell company.

There are several requirements in order to qualify for the Rule 144:

1. The unregistered stock has been held for the required period of time, twelve months if the Seller is an affiliate or the Issuer was non-reporting, and six months if the Seller was a non-affiliate and the Issuer;
2. The Issuer cannot be a shell company;
3. The Seller was had not been an Affiliate or Control person within 90 days prior to the sale.

A person satisfying the applicable conditions of the Rule 144 safe harbor is deemed not to be engaged in a distribution of the securities and therefore not an underwriter of the securities for purposes of Section 2(a)(11).

The Rule 144 exemption to registration is not available for unregistered sales of stock if the Issuer is a "shell" company.  A "shell" company is generally defined by Rule 144 as an Issuer that has no, or nominal, assets and operations.  However, contrary to the SEC's meritless and completely unsubstantiated claims, both JB&ZJMY Holding Co. and Dolat Ventures had more than nominal assets and operations as the preceding sections evidence, thus,

---

obligation was converted into a convertible instrument in the Resolution.  The convertible debt was properly aged and inadvertent errors in the opinion are not fatal.  The important issue is whether the exemption is available.

neither of those companies was a shell company and the Rule 144 exemption was available to the converted stock transactions.

## IV   ARGUMENT  AND  AUTHORITY

### A.  THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Under Rule 12(b)(6), the Court may dismiss a Complaint if it fails to state a claim upon which relief can be granted.  See, Fed. R. Civ. P. 12(b)(6).  A pleader must plead specific facts that show proof of the Plaintiff's claim for relief.  In Bell Atlantic v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), the United States Supreme Court created *a heightened standard* for pleading in federal court. A complaint must contain sufficiently specific *factual detail* to state a plausible claim for relief.  Bell Atlantic v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  The standard for pleadings are heightened even further for fraud claims requiring that it be pled with particularity and specification.   A complaint should be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Id.  In the case at bar, it is clear that the SEC can prove no set of facts in support of his claim which would entitle him to relief, since all of the SEC's claims for relief are meritless and unsubstantiated.  Taylor v. Bear Stearns & Co., 572 F. Supp. 667 (N.D. Ga. 1983).  The Taylor court stated "there are many sound reasons for requiring that fraud must be pled with particularity."  Id.

Plaintiff must comply with its obligation to provide the 'grounds' of its 'entitle[ment] to relief'.  See, Twombly, 550 U.S. 544 (2007).  In the case at bar, the SEC's factual allegations are insufficient to raise a right to relief above the speculative level on the assumption that all of the

complaint's allegations are true. Id. See also, <u>Taylor v. Bear Stearns & Co.</u>, 572 F. Supp. 667 (N.D. Ga. 1983)

Even prior to the stricter pleading standard implemented by <u>Twombly</u> and <u>Iqbal</u> the second circuit held that a plaintiff is required to allege some factual details in order "to disclose adequate information as the basis of his claim for relief as distinguished from a bare averment that he wants relief and is entitled to it." <u>Naglar v. Admiral Corp.</u>, 248 F.2d 319, 324 (2d Cir. 1957). The other purpose was to provide pleaders with a reasonable opportunity to obtain proof of their allegations before confronting a challenge on the merits. The purpose of a motion to dismiss "for failure to state a claim upon which relief can be granted" is to test the formality of a statement of a claim for relief, that is, the legal sufficiency of the complaint." At the least, Rule 12 attempts "to expedite and simplify the pretrial phase of federal litigation while at the same time promoting the just disposition of cases."

Where a complaint is attacked by a Rule 12(b)(6) motion to dismiss, *a plaintiff has an obligation to provide the "grounds" of his "entitle[ment] to relief", which requires more than labels and conclusions*, and a formulaic recitation of a cause of action's elements will not do. <u>Bell Atlantic v. Twombly</u>, 550 US 544 (2007). Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Id.

Rule 8 requires sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Bell Atlantic v. Twombly</u>, 550 US 544 (2007);  F. R. Civ. Proc., Rule 8. Pleadings must be non-conclusory, factual, and plausible to survive a Motion to Dismiss based on an inadequate complaint. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). The plausibility standard is not akin to a

"probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' Ashcroft v. Iqbal, 556 U.S. 662 (2009).

As the Court in Twombly held, there must be enough material provided in the complaint to support a reasonable inference that the defendant was responsible for the alleged harm.  The assertions in the complaint must be more than conclusory allegations, which do not need to be accepted as true.  Bell Atlantic v. Twombly, 550 US 544 (2007).  In the case commentary to Ashcroft, the Court identified the higher pleading standard stating; "[t]he original rule holding that general notice was sufficient in a complaint ***has been replaced with a more demanding standard that requires greater factual details.***  The standard requires that the facts pled be plausible, enough to support reasonable inferences. See, Ashcroft v. Iqbal, 556 U.S. 662 (2009). The new standard requires a pleader to amplify a claim with factual allegations to render it plausible.  Id.

Discussing Twombly, the Court in  Ashcroft v. Iqbal, 556 U.S. 662 (2009) identified two working principles underlying the Twombly decision.  First, the tenet that a court must accept a complaint's allegations as true is *inapplicable to threadbare recitals of a cause of action's elements*, supported by mere conclusory statements. Id.  Second, determining whether a complaint states a plausible claim *is context-specific, requiring the reviewing court to draw on its experience and common sense*. Ibid.

Contrary to the pleading standard mandated by Twombly and Ashcroft, the SEC's factual allegations are insufficient to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.  Instead, the SEC's Complaint is comprised merely of ***threadbare recitals of a cause of action's elements***, that are meritless and

19

unsubstantiated.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' Ashcroft v. Iqbal, 556 U.S. 662 (2009).  The SEC's Complaint does just that; its allegations are merely conclusory statements, and therefore insufficient.  Asking for plausible grounds requires the Complaint to contain enough substantiated facts to raise a reasonable expectation that discovery will reveal evidence of the illegality claimed. See, DuraPharma.,Inc. v. Brouda, 544 U.S. 336 (2005).

### 1. Plaintiff has failed to state a claim that Defendant manufactured a fraudulent Convertible Note violating Rule 5 and Rule 10b

The Plaintiff claims that the Dolat Convertible Note, dated October 13, 2015, was actually drafted in November 2016 and fraudulently backdated are wholly without merit and are refuted by numerous affidavits, including the individual that signed the Note. The SEC allegations that Defendants drafted a fraudulent Note in 2016, and forged the signature of Dr. Steven Stein on that Note are not supported by any evidence or legal authority, and such allegations are merely bare assertions with no factual support whatsoever.  Specifically, paragraph 34 of the SEC's Complaint alleges:

> In the course of reviewing DOLV's corporate records in connection with the reverse merger, Thurlow and Oravec discovered that DOLV purportedly owed its former accounting firm…$14,115 for services rendered in or about 2013."

In paragraph 37 of the Complaint the SEC asserts that Thurlow drafted the Accounting Note in fall 2016, but dated the note October 13, 2015.  Paragraph 37 states: "Thurlow drafted the Accounting Note in fall 2016, but dated the note October 13, 2015. The note was convertible to shares of Dolat at a rate of $0.0001 per share (for a total of 141,150,000 shares)".

The SEC's allegation that "backdating" a Note is unlawful is, as with every one of its other allegations in this lawsuit, without any legal merit.  A convertible Promissory Note is a

'negotiable instrument' (debt Instrument).  See, UCC § 3-104.  Debt Instruments are Contracts between the corporation and the holder, and the rights and privileges of the holder are determined by the terms of the Note.  Id.  UCC § 3-113(a) very clearly states: "An instrument may be antedated [backdated] or postdated."  Pursuant to UCC § 3-113 (b) the date of a Note is the date of its issue; the date that a Holder is given rights under the Note.  See, UCC § 3-113.

The Complaint continues its meritless claims alleging that the motive for creating and forging the Dolat Note, was so that the Defendants could have their associates purchase the Note in several tranches (installments), and then convert each portion of the Note's Debt into millions of allegedly fraudulently obtained unregistered shares to be sold into the open market for huge profits.  The Cornerstone of the SEC's claimed scheme is that the Dolat Note was fraudulently backdated and forged to satisfy the year-long holding requirement in order to convert the debt into free trading stock by utilizing the Rule 144 exemption to registration, so that the converted stock could be sold immediately on the open market.  However, these allegations are merely bare assertions and unsubstantiated conclusions that are not supported by any of the facts or evidence in the case.  There are numerous affidavits testifying that the Dolat Note was created in October 13, 2015, just as the date on the Note indicates.

In paragraph 38 of the Complaint the SEC makes another unsubstantiated conclusion asserting that Dr. Stein's signature was forged.  Dr. Stein, the Maker of the Dolat Note, testifies in his affidavit that it was _his own signature_ on the Dolat Note, and that the Note was not forged or backdated.  In addition, in conjunction with the sworn testimony of several other individuals (whose sworn affidavits are attached hereto), as well as documentary evidence, it is evident that Simon Thurlow couldn't have drafted and forged the Dolat Note in the fall of 2016, but instead, all of the evidence shows that the Note was actually issued in October 2015.  Dr. Stein's sworn

testimony stating that he signed the Note, thus it wasn't forged, again directly refutes the SEC's

meritless and unsubstantiated claim that the Dolat Note was forged.

     The SEC's complaint is rife with these unsubstantiated claims, bare-bones

allegations, and unsubstantiated conclusions, like those averred in paragraphs 34, 37, 38, of the

Complaint, that lack the support of any specific or particular facts and are wholly without merit.

     Also, Anying Huang, (Mr. Wang's translator) who was the purchaser of the Dolat Note,

testifies in his affidavit, that he purchased the Dolat Note from ESSG (DaParma), the original

holder of the Note.  He testifies in his affidavit that the Dolat Note was originally created in

October 2015 resulting from a debt for accounting services.   The Huang affidavit states:

> "I was the purchaser for value for USD $4000 of a convertible debt instrument with a
> face value of $14,115 dated October 2015 formerly held by Executive Support Services a
> Dolat service provider".

Thus, again, contrary to the SEC's meritless allegations, the actual purchaser of the original

Dolat Note, testifies that the Note was created in October 2015 as a result of delinquent

accounting debt.

     Also, Brinsley Holman ("Holman"), a British national who runs Keith Bayley & Rogers

Co., Ltd., has known Mr. Thurlow for over 30 years, both professionally and personally, has

submitted an affidavit (attached hereto as Exhibit I) stating that he discussed the Note and was

sent a copy of the Note in August of 2016.  Mr. Thurlow contacted his friend about opening

brokerage accounts for potential foreign purchasers of Dolat stock; they also discussed the Dolat

Note.

     In addition, Dolat's December 31, 2015 year-end financials identify the Dolat Note in

Note 5 "Notes Payable" located under the Section of the Financials known as the "Notes to the

Unaudited Financials" identifying the date of the Dolat Note as October 13, 2015  (the relevant

excerpts of the **2015 Dolat Financials are attached hereto as Exhibit J).**   The Dolat 2015

Financials were uploaded to OTC Markets website in order to satisfy its duty to make adequate current information about the issuing company publicly available.  This is further evidence that the Dolat Note was not fraudulently drafted by Defendant Thurlow in November of 2016, but was in fact entered into on October 13, 2015 as identified in the Dolat Note itself.  Consequently, the sworn testimony, financials and other relevant documentation shows that the great weight of the evidence directly contradicts the SEC's unsubstantiated claims, most notably the meritless claim that the Dolat Note was fraudulently created, backdated and forged by the Defendants.

**2. Plaintiff has failed to state a claim that Dolat Ventures was a shell company, therefore the Rule 144 exemption to registration was available for the sale of the Converted Shares**

The SEC has failed to state a claim that Dolat and JB&ZJMY Holding were shell companies, therefore the sale of the Converted Stock by Defendants Boucher and Jordan was exempt under Rule 144, and such sales of stock were lawful.  The SEC alleges that the sales of the Converted Stock at issue in this litigation, violated Section 5, because the securities had not been registered with the SEC and the Rule 144 exemption to registration asserted by the sellers was not available to the sellers because Dolat was a shell company.  However, the SEC's claim that Dolat and JB&ZJMY Holding were shell companies, is wholly without merit, since the evidence shows that both companies were operating fully and had noncash assets in excess of $2.6 million.

The SEC's claims fail to disclose adequate facts and information as the basis of the claim for relief, because its allegations are merely bare recitations of the elements of the alleged wrongdoing entitling it to relief.  See, Naglar v. Admiral Corp., 248 F.2d 319, 324 (2d Cir. 1957).  A complaint must contain sufficient factual detail to state a plausible claim for relief. That general notice was sufficient in a complaint *has been replaced with a more demanding standard* that requires greater factual details.  The standard requires that the facts pled be

plausible, enough to support reasonable inferences. See, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).

The standard for pleadings are heightened even further for fraud claims requiring that it be pled

with particularity and specification.  <u>Taylor v. Bear Stearns & Co</u>., 572 F. Supp. 667 (N.D. Ga.

1983).

In the present case, rather than pleading specifically detailed and particular facts that

showed it was entitled to relief, the SEC simply avers in the Complaint that  Dolat was a shell

company, and because it was a shell company, Rule 144 was not available to the Defendants as

an exemption to the registration requirements of the Securities Act, and in turn, every sale of the

Dolat stock at issue in this litigation was unregistered constituting a violation of the registration

requirements mandated by Section 5 of the Securities Act.

For instance, at paragraph 51 of the Complaint, the SEC avers: "the Las Vegas Attorney

opined that [Dolat] was not a shell company, [but] in fact, DOLV was a shell company because it

had no or nominal operations and no assets as described above".  Paragraph 51 is merely a bare

recital of the elements of the claim not substantiated by any particular or substantiating facts, but

rather, a bare recitation that Dolat "was a shell company because it had nominal operations and

no assets", rather than alleging specific, particular facts that made such bare assertions plausible.

The fact of the matter is that prior to the merger of Dolat and JB&ZJMY Holding, neither

company was a shell company because each company had sufficient operations and sufficient

assets to qualify as a non-shell company.

Contrary to the SEC's bare assertions that Dolat had nominal operations and no assets,

Dolat, had assets in excess of $2.6 million and ongoing operations as its financials prove after the

merger, and, as of December 2016, Dolat had assets exceeding 7 million dollars, directly

contradicting the SEC's bare assertions that Dolat was a shell company.

In addition, after the merger and subsequent sale of the converted stock, JB&ZJMY Holding Co. had ongoing operations related to the manufacture of electric-car batteries and electric cars, and owned six patents. *(See  Exhibit K).*  As at March 31, 2017, the total assets of Dolat Ventures, Inc. was $2,686,683**, (See, Exhibit L)***.*   Consequently, in direct contradiction to the SEC's baseless claims, JB&ZJMY was an operating company with assets, of 2.6 million dollars.

Therefore, it is abundantly evident that both Dolat and JB& ZJMY Holding Co., (operating an electric car and battery manufacturing business with patents and noncash assets in excess of 7.2 million USD) were not shell companies.

In addition to the financial statements and documentary evidence (identified above), there are several opinion letters written by securities attorneys opining that neither Dolat nor JB&ZJMY were shell companies, based on their extensive investigation of relevant documents. In fact, as is identified and discussed above, there were several legal opinions written that state/opine that Dolat Ventures, Inc. was not at that time or in the past a shell company. Specifically;

-   In a legal opinion letter dated August of 2014 attorney Frederick Bauman, of the law firm Bauman and Associates, issued a legal opinion stating that Dolat Ventures, Inc. *was **not*** at that time or in the past, a shell company.  Mr. Bauman's opinion states that the company had far more than nominal operations and that such operations never lapsed. The opinion also stated that in 2008 and 2009 filings the Company inadvertently checked the "shell company" box, however that was a mistake;
-   Additional opinions for the Dolat stock written by attorneys: Benjamin Bunker and Park Lloyd,  issued opinions agreeing with Mr. Bauman that the Company was not a shell.

Defendant's facts and evidence attached and identified herein, directly contradict and disprove the SEC's are assertions, meritless claims and unsubstantiated allegations that Dolat was a shell company.  Consequently, the SEC has failed to state a claim that Dolat and JB&ZJMY Holding were shell companies.

3. **The Plaintiff has failed to state a claim that the Seller's of the Converted stock were Affiliates of Dolat**

An "affiliate" is defined as a person, such as an executive officer, a director or large shareholder, in a relationship of control with the issuer. Control means the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise.  Pursuant to Rule 144(a) (1), an affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.  Control means the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise.

None of the Defendants had the authority or power to direct Dolat's management or company policies.  Mr. Boucher, Mr. Jordan, Mr. Oravec and Brad Fidler had no power whatsoever to direct the management and policies of the company.  Mr. Fidler was merely the attorney Mr. Wang hired to bring Dolat into compliance, and Mr. Thurlow was Mr. Fidler's chief clerk performing only the legal services that Mr. Fidler instructed him to perform.  None of the Defendants was in a relationship of control with Dolat.  Mr. Wang had all of the control of Dolat Ventures/JB&ZJYM, and he alone dictated the management of the Company.

Consequently, since none of the Defendants had the authority or power to control or direct Dolat's management or company policies, they were not affiliates of Dolat Ventures.

4. **Since the Dolat Note was actually issued October 13, 2015 it was held for over one year thereby satisfying both the 6 Month and One Year Holding Period of Rule 144 rendering the stock sales at issue as Lawful.**

Rule 144 provides an exemption to the registration requirements and permits the public resale of restricted or control securities if a number of conditions are met, including how long the securities are held.  The Rule 144 "holding period" for the resale of restricted securities is six

months from the date of sale for securities issued by a reporting issuer or one year from the date

of sale for securities issued by a non-reporting issuer.  Rule 144(d)(1) states in part:

> **(i)** If the <u>issuer</u> …is, and has been for…90 days immediately before the sale, subject to the reporting requirements … of the <u>Exchange Act</u>, a minimum of six months must elapse between the…acquisition of the securities …and any resale of such securities… .

> **(ii)** If the issuer is not…subject to the reporting requirements…of the Exchange Act, a minimum of one year must elapse between…the date of the acquisition of the …and any resale of such securities… .

Dolat was a reporting company at the time that the alleged stock sales took place, and 90

days prior to such sale, consequently it was subject to the 6 month holding of the Dolat Note

from October 13, 2015 as required by Rule 144(d)(1)(i).  Since the stock sale took place in April

of 2017, more than the required 6 months had elapsed and thus having satisfied all of the other

144 requirements, the stock sales were lawfully sold pursuant to the Rule 144 exemption.

In fact, as this Brief addresses above, the Dolat Note was issued in October of 2015, (as Dr.

Stein and several others whose affidavits are attached hereto) and had therefore been held for

over one year satisfying the greater of the two holding periods prior to sale.

### B.  <u>CONCLUSION</u>

The SEC's Complaint must be dismissed because its factual allegations are insufficient to

raise a right to relief because it can prove no set of facts in support of his claim which would

entitle it to relief.  Specifically, the SEC's claims that the sale of the converted stock was

unlawful because the Dolat Note was fraudulently backdated and forged, and that Dolat was a

shell company, are directly refuted by the specific facts, affidavits, documentary evidence, and

financials submitted herein by the Defendants.  Rather than pleading sufficiently specific *<u>factual</u>*

*<u>detail</u>* to state a plausible claim for relief, the SEC merely states bare assertions, meritless,

unsubstantiated claims and conclusions that lack any facial plausibility and are completely

contrary to the facts and evidence.  Thus, the SEC's complaint is nothing more than a tatty,

reused cardboard box held together by a few strips of tape and the earnest hopes of the sender that it will survive the rigors of the postal system and arrive through some miracle at its destination with the contents intact.  Since the SEC's Complaint fails to satisfy the pleading requirements set out in Twombly and Ashcroft, and in turn, merely regurgitates bare assertions and unsubstantiated conclusions it can prove no set of facts in support of its claim entitling it to relief, the Complaint must be dismissed.

Consequently, based on the foregoing reasons, Simon Thurlow and the other defendants respectfully request that the SEC's Complaint be dismissed.

Filed this 20th day of December 2021.

BY: SIMON THURLOW, *Pro Se*


*/s/ Simon Thurlow*
*Simon Thurlow*


/s/Roger L. Fidler
Roger L. Fidler
Attorney for Defendants
Bryce Boucher
Joseph Jordan
Bradley Fidler
Richard Oravec
Western Bankers Capital, Inc.
And Pro Se