**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

          **-- against --**

**SIMON PIERS THURLOW,**
**ROGER LEON FIDLER, ESQ.,**
**RICHARD ORAVEC,**
**BRADLEY FIDLER,**
**BRYCE EMORY BOUCHER,**
**JOSEPH D. JORDAN,**
**and WESTERN BANKERS CAPITAL INC.,**

                    **Defendants.**

**21 Civ. 7700 (VSB)**

**ECF Case**

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**RESPONSE IN OPPOSITION TO DEFENDANTS' 12(b)(6) MOTION TO DISMISS**

Victor Suthammanont
Mary Kay Dunning
Ladan F. Stewart
U.S. Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-5674 (Suthammanont)
suthammanontv@sec.gov

January 27, 2022

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

Preliminary Statement ............................................................................................ 1

The Complaint's Factual Allegations ..................................................................... 2

   I.  The Reverse Merger ........................................................................................ 2

   II.  The 2016 Convertible Note ........................................................................... 3

   III. The February 2017 Purchases of DOLV Debt by Boucher and Jordan/WBC .................. 4

     A.  Boucher's Debt Purchase, Conversion, and Share Sales ............................... 4

     B.  Jordan and WBC's Debt Purchase, Conversion, and Share Sales ................... 6

     C.  The April, May, and July 2017 Boucher Debt Purchases, Conversions, and Share Sales ............. 6

       i.  April 2017 ........................................................................................ 7

       ii. May 2017 through July 2017 ............................................................. 7

     D.  The Proceeds of Boucher's Conversions ................................................... 9

   IV. The 2017 Convertible Note ........................................................................... 9

   V.  The July and October 2017 Bradley Fidler Debt Purchases, Conversions, and Share Sales ........... 10

     A.  July 2017 ...................................................................................... 10

     B.  October 2017 ................................................................................. 10

Argument ................................................................................................... 11

   I.  The Legal Standard for Considering a Motion to Dismiss ................................. 11

     A.  Defendants' Motion Ignores the Proper Legal Standards ............................. 12

   II.  The Complaint Adequately Alleges Violations of the Anti-Fraud Provisions ................. 14

     A.  The Antifraud Provisions of the Federal Securities Laws ............................. 14

     B.  Defendants' Liability under the Antifraud Provisions ................................. 15

       i.  The Complaint Sufficiently Alleges Violations of Sections 17(a)(2) and Rule 10b-5(b) by Thurlow, Oravec, Boucher, and Bradley Fidler ................. 15

ii.  The Complaint Sufficiently Alleges Violations of Sections 17(a)(1) and (2) and Rules 10b-5(a) and (c) Against the Fraud Defendants ....................... 17

iii. The Complaint Sufficiently Alleges Scienter ................................................... 18

iv. The Fraud Was in Connection with the Sale of Securities ............................. 19

v.  Defendants' Response to the Allegations Does Not Undermine the Adequacy of the Pleading ........................................................................... 19

III. The Complaint Adequately Alleges that Defendants Violated the Securities Registration Provisions of Section 5 of the Securities Act ................................................ 20

A.  The SEC Adequately Pleaded a *Prima Facie* Case Against Defendants.................... 20

B.  No Exemption Applies........................................................................................ 22

i.  Exemptions from the Registration Requirements Do Not Apply to Defendants' Offerings.................................................................................. 23

ii. "Safe Harbors" Did Not Apply to Defendants' Distributions ........................ 24

IV. The Complaint Adequately Alleges Aiding and Abetting Claims................................... 26

Conclusion .......................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ........................................................................... 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 11

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...................... 12

*Basic v. Levinson*, 485 U.S. 224 (1988) .................................................................... 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 11

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .............................................................................................................. 11

*Eternity Glob. Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 176 (2d Cir. 2004) ..................................................................................................................... 12

*Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2005) ............ 12

*Hernandez v. Premium Merch. Funding One, LLC*, 2020 WL 3962108 (S.D.N.Y. Jul. 13, 2020) ..................................................................................................................... 13

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ...................................... 13

*Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99 (2d Cir.1999) ......................... 13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...................................................... 12

*Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745 (S.D.N.Y. 2018) ..................... 13

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ............................................................ 27

*SEC v. Botvinnik*, 2019 WL 4738900 (S.D.N.Y. Sept. 29, 2019) ............................ 14

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) ....................................... 21, 26

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ....................................................... 21

*SEC v. Cavanagh,* 445 F.3d 105 (2d Cir. 2006) ....................................................... 22

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738 (2d Cir. 1941) ................. 21

*SEC v. Czarnik*, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) .......................... 15, 17

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ........................................................... 27

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) .................................................... 14, 15

*SEC v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009) ................................................ 12

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................ 14

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) .......................................................... 23, 24

*SEC v. Mattera*, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) .................................. 21

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ............................ 14, 15

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) ............................................................... 15

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ................................................................. 20, 22

*SEC v. Ramoil Mgmt., Ltd.*, 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) ................................ 17

*SEC v. Sayid*, 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019) ....................................................... 15

*SEC v. Sugarman*, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ............................................. 13

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ...................................... 21

*United States v. Corr*, 543 F.2d 1042 (2d Cir. 1976) .................................................................. 23

*United States v. Naftalin,* 441 U.S. 768 (1979) ..................................................................... 15, 19

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938) ................................................................. 27

**Statutes**

15 U.S.C. § 77b ............................................................................................................................ 23

15 U.S.C. § 77d(a)(1) .................................................................................................................. 23

15 U.S.C. § 77e ............................................................................................................................... 1

15 U.S.C. § 77o ............................................................................................................................ 26

15 U.S.C. § 77q(a) .............................................................................................................. 1, 14, 26

15 U.S.C. § 77q(a)(1) .................................................................................................................. 18

15 U.S.C. § 77q(a)(2) ....................................................................................................... 1, 16, 17

15 U.S.C. § 77q(a)(3) ........................................................................................................... 15, 18

15 U.S.C. § 78j .................................................................................................................... 1, 14, 26

15 U.S.C. § 78t ............................................................................................................................. 27

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 11

Fed. R. Civ. P. 9(b) ..................................................................................................................... 12

**Regulations**

17 C.F.R. § 230.144 ...................................................................................................... 16, 24, 25, 26

17 C.F.R. § 230.405 ..................................................................................................................... 23

17 C.F.R. § 240.10b-5 ....................................................................................................... passim

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") filed this action in light of a fraudulent scheme—including falsifying documents and making material misrepresentations to attorneys and others—undertaken by Defendants Simon Piers Thurlow ("Thurlow"), Roger Leon Fidler ("Fidler"), Bryce Boucher ("Boucher"), Richard Oravec ("Oravec"), and Bradley Fidler (collectively, the "Fraud Defendants") in order to circumvent securities-registration and disclosure requirements designed to protect investors. The Fraud Defendants, along with Defendants Joseph D. Jordan ("Jordan") and Western Bankers Capital, Inc. ("WBC") (together, with the Fraud Defendants, the "Defendants"), then illegally distributed millions of dollars of the fraudulently obtained shares to unsuspecting investors in 2017. By doing so, Defendants violated Sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a) and (c), and the Fraud Defendants violated and aided and abetted each other's violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10b-5 thereunder17 C.F.R. § 240.10b-5.[1] DE 1 ¶ 8.

The SEC's detailed Complaint alleges that, in connection with a 2016 reverse merger between Dolat Ventures, Inc. ("Dolat" or "DOLV") and a Chinese company, Thurlow, Fidler, and Oravec generated a convertible note in the fall of 2016 and falsely backdated it to October 2015. They then, together with a strawman affiliated with DOLV, arranged for Boucher, Jordan (through WBC), and Bradley Fidler to purchase tranches of the notes, convert the debt to shares, and sell those shares to the public in an unregistered offering. In addition, in or about July 2017,

---

[1]     The Commission did not allege that Fidler directly violated Securities Act Section 17(a)(2) or Rule 10b-5(b).

Thurlow drafted a second convertible note, purportedly evidencing debt incurred in 2012, that he and Fidler arranged for Bradley Fidler to convert to shares and sell to the public.

The backdating of the notes, as well as material misrepresentations and omissions concerning them, and the debt purchase and conversion transactions were necessary to deceive various "gatekeepers," including attorneys, DOLV's transfer agent, and a brokerage firm, that the sale of DOLV shares derived from the convertible note fell within exemptions from the SEC's registration requirements. But for this deception, Defendants would not have been permitted to sell their shares. In total, Defendants created and sold more than 133 million shares of DOLV stock in the open market for $5.7 million in proceeds.

Largely ignoring the more than one hundred paragraphs of well-pleaded factual allegations in the Complaint, Defendants bring the instant motion to dismiss the Complaint ("Motion"), DE 36 & 37, on the basis of purported facts, evidence, and affidavits outside of the Complaint, including thirteen exhibits appended to the Motion, DE36-1 through DE 36-13, and which cannot be considered by the Court under Rule 12(b)(6). Defendants' arguments—to the extent they can be considered—are meritless because the Complaint alleges in sufficient factual detail that Defendants sold unregistered securities in violation of Section 5 of the Securities Act and, in so doing, with the exception of Jordan and WBC, engaged in numerous deceptive acts in violation of the antifraud provisions of the Securities Act and the Exchange Act. As explained below, drawing all inferences in favor of Plaintiff, the Complaint more than adequately states claims for securities laws violations, as well as aiding and abetting liability. Accordingly, the Motion should be denied.

## THE COMPLAINT'S FACTUAL ALLEGATIONS

### I.   The Reverse Merger

In December 2015, DOLV, a publicly traded microcap issuer that was purportedly a

2

mining business with interests in Sierra Leone, stated its intent to change its business to own and operate rental properties in the United States. On December 29, 2015, an associate of DOLV's former controlling shareholder became the sole officer, director, and president of DOLV (the "Nominal Director"). Compl. ¶ 29 (DE 1) (hereinafter, references to "DE 1" are to the Complaint). In or about August 2016, Fidler, a licensed attorney, and Thurlow, his purported law clerk and a microcap consultant, learned that DOLV was available for sale. DE 1 ¶¶ 13, 14, 30. At or around this time, Oravec learned from a finder in China that a Chinese national named DeQun Wang ("Wang"), who purportedly owned JB&ZJMY Holding Company, Ltd. ("JBZY"), purportedly an electric car and battery manufacturer, wanted to publicly list JBZY in the United States. DE 1 ¶ 31. Oravec contacted Thurlow, who told him that DOLV was available for purchase. DE 1 ¶ 32. Oravec then told Wang that DOLV was for sale, and Wang agreed to take control of Dolat. DE 1 ¶ 32. Thurlow, Fidler, and Oravec negotiated and structured the reverse merger transaction by which DOLV would acquire JBZY. DE 1 ¶ 33.

## II.   The 2016 Convertible Note

While reviewing DOLV's corporate records in the fall of 2016, Fidler and Thurlow discovered that DOLV purportedly owed its former accounting firm ("Accounting Firm"[2]) $14,115 for services rendered in or about 2013. DE 1 ¶ 34. Oravec contacted the Accounting Firm's owner, who agreed that DOLV would issue a convertible note (i.e., a note convertible to shares of DOLV), evidencing the $14,115 debt (the "Accounting Note"), and that the Accounting Firm's owner would then sell the Accounting Note for $4,000 as part of the reverse merger. DE 1 ¶ 35. Oravec and Thurlow arranged for a Chinese translator ("Translator") to purchase the Accounting Note from the Accounting Firm's owner. DE 1 ¶ 36.

---

[2]    All terms not otherwise defined herein have the meaning ascribed to them in the Complaint.

Thurlow drafted the Accounting Note in the fall of 2016, but he dated the note "October 13, 2015." The note was convertible to DOLV shares at a rate of $0.0001 per share, for a total of 141,150,000 shares. DE 1 ¶ 37. Oravec obtained the Accounting Firm owner's signature on the falsely dated Accounting Note in or around December 2016, and Fidler, Thurlow, or Oravec placed the Nominal Director's signature on the Accounting Note at or around the same time. DE 1 ¶ 38. As noted above, the Nominal Director did not become an officer of DOLV until December 2015, more than two months after the purported date of the Accounting Note. *Id*.

On December 2, 2016, the DOLV reverse merger closed, with Wang purportedly paying the $110,000 sale price. DE 1 ¶ 40. Following the closing, Fidler, Thurlow, and Oravec worked to bring DOLV's listing on OTC Markets to "current" status, in part by arranging for the drafting and filing of unaudited financial statements, thereby increasing the investing public's interest in purchasing DOLV's shares. DE 1 ¶ 41.

## III.    The February 2017 Purchases of DOLV Debt by Boucher and Jordan/WBC

Boucher, a microcap investor, and Jordan, the owner of WBC, are long-time acquaintances of Thurlow. DE 1 ¶¶ 18, 42. In February 2017, Boucher and Jordan/WBC each purportedly approached Thurlow separately to purchase convertible debt of DOLV. DE 1 ¶ 42.

### A.  Boucher's Debt Purchase, Conversion, and Share Sales

On February 22, 2017, Boucher purchased $2,600 worth of the Accounting Note debt, purportedly from the Translator, although Boucher paid the $2,600 purchase price to Oravec at the Translator's direction. DE 1 ¶ 44; *id.* at Table 1 ("DOLV Conversions and Sales by Defendants"). Oravec and the Translator agreed that Oravec would use the payments to advance DOLV's interests in the United States, including by bringing DOLV's OTC Markets listing up-to-date. DE 1 ¶ 44. Thurlow prepared the share conversion documents. *Id*. Boucher converted the $2,600 of debt to 26 million DOLV shares. DE 1 ¶ 45.

Thurlow and Oravec arranged for Boucher to obtain an opinion letter from a Las Vegas attorney ("Las Vegas Attorney") for DOLV's transfer agent ("Transfer Agent 1"), stating that the DOLV share issuance and contemplated sale did not violate Section 5 of the Securities Act. DE 1 ¶ 46. To support the opinion letter, Oravec provided the Las Vegas Attorney with the Accounting Note and the debt purchase/assignment documents. DE 1 ¶ 48. In his transmittal email to the Las Vegas Attorney, Oravec stated that the Accounting Note was "the original acquired Debt from 2015[,]" even though he knew that the agreement to purchase the debt was not negotiated and signed until late 2016. DE 1 ¶ 49. The Las Vegas Attorney issued the opinion letter to Transfer Agent 1, dated March 23, 2017, stating that Boucher was deemed to be the holder of the DOLV shares for at least twelve months pursuant to Rule 144(d)(1)(ii) of the Securities Act, when, in actuality, the Accounting Note was only approximately four months old, and, as such, did not comply with the rule's requirements. DE 1 ¶ 50. The Las Vegas Attorney also opined that DOLV was not a shell company, even though it had no assets and no or nominal operations. DE 1 ¶ 51.

Boucher's broker ("Broker") refused to accept the DOLV shares from Transfer Agent 1 or to remove the internal restrictions it had placed on the trading of the shares because the Las Vegas Attorney did not satisfy its internal criteria for the types of attorney from whom it would accept opinion letters. DE 1 ¶¶ 52-53. Oravec contacted Charles Parkinson Lloyd ("Lloyd"), an attorney at a Salt Lake City law firm that met the Broker's criteria, and forwarded him the debt purchase documentation, including the backdated Accounting Note. DE 1 ¶ 54.

Lloyd drafted a representation letter for Boucher's review, and Boucher executed the letter, knowing that it contained the following misrepresentations: DOLV had not been a shell issuer for the previous twelve months; and Boucher would "not undertake any re-sale of the [Dolat] shares in concert with any other persons." DE 1 ¶¶ 55-56. Lloyd issued an opinion letter,

dated March 24, 2017, to the Broker, stating that his letter was based "on representations and warranties" made to him and on documents provided to him, including the backdated Accounting Note. *Id.* Lloyd opined in his letter that Boucher's DOLV shares were "freely tradable" and "that there were was no restriction on the open market sale" of the shares. DE 1 ¶ 56. The Broker then accepted the deposit of Boucher's DOLV shares and removed its restrictions on the sale of the shares. DE 1 ¶ 57. Between March 29 and 31, 2017, Boucher sold nearly 26 million DOLV shares for proceeds of more than $267,000. DE 1 ¶ 58.

### B.  Jordan and WBC's Debt Purchase, Conversion, and Share Sales

In February 2017, Jordan approached Thurlow to purchase convertible debt in DOLV through WBC. DE 1 ¶¶ 42, 59. To effectuate the conversion of DOLV shares by Jordan/WBC, Thurlow and Oravec arranged for the Las Vegas Attorney to issue an opinion letter to Transfer Agent 1 for which Oravec paid. DE 1 ¶ 61. Thurlow and Fidler then arranged for Lloyd to issue an opinion letter to the Broker regarding Jordan/WBC's shares, to allow it to remove the trading restrictions on the shares. DE 1 ¶ 62. Jordan executed a representation letter, dated April 3, 2017, drafted by Lloyd, in substantially the same form as the letter Lloyd drafted for Boucher to sign the prior month. DE 1 ¶ 64. The next day, Lloyd issued an opinion letter to the Broker in substantially the same form as the letter he issued for Boucher the prior month, and the Broker removed its restrictions on the sale of the shares. DE 1 ¶ 65. Between April 6 and May 15, 2017, Jordan/WBC sold nearly 26 million DOLV shares for proceeds of more than $1.27 million. DE 1 ¶ 66.

### C.  The April, May, and July 2017 Boucher Debt Purchases, Conversions, and Share Sales

On April 7, 2017, Oravec posted a "press release," drafted by Thurlow and Fidler, announcing the December 2016 reverse merger of DOLV with JBZY, following which the price

of DOLV stock nearly doubled, increasing from a close of $0.0325 per share on April 7, 2017, to a close of $0.0621 per share on April 10, 2017, the next trading day. DE 1 ¶¶ 68-69.

### i.  April 2017

On April 10, 2017, Boucher purchased another tranche of the Accounting Note debt nominally owned by the Translator for $2,600 (convertible into 26 million shares worth in excess of $1.2 million), which he paid to Oravec's company, Pivo Assoc. Inc. ("Pivo"). DE 1 ¶ 70. A week later, Oravec asked the Las Vegas Attorney for another opinion letter for Boucher's debt. DE 1 ¶ 71. Oravec provided the same debt purchase, assignment, and conversion documents that he had provided the Las Vegas Attorney in connection with his March request, but he superimposed a new date—April 10, 2017—on the February documents purportedly signed by Wang. DE 1 ¶ 72. On April 17, 2017, the Las Vegas Attorney issued the opinion letter to Transfer Agent 1 in a form identical to his March 23, 2017 opinion letter. DE 1 ¶ 74.

Subsequently, Boucher executed a representation letter to Lloyd, referring to the April 17, 2017 Las Vegas Attorney's letter and falsely stating the following: Boucher would "not undertake any re-sale of the Shares in concert with any other persons;" DOLV was not a shell company; and the transaction was "not part of a scheme to evade the 1933 Act registration requirements." DE 1 ¶ 75. Lloyd issued an opinion letter to the Broker on April 27, 2017, in the same form as his March letter for Boucher, whereupon the Broker removed its restrictions on the sale of the DOLV shares. DE 1 ¶¶ 77-78. Between May 1 and 30, 2017, Boucher sold nearly 26 million DOLV shares for proceeds of approximately $970,000. DE 1 ¶ 79.

### ii.  May 2017 through July 2017

On May 25, 2017, Boucher purchased $1,250 worth of the Accounting Note for $20,000, which he again paid to Oravec's company, Pivo, even though the debt was ostensibly owned by

7

the Translator. DE 1 ¶ 80. The debt was convertible into 12.5 million DOLV shares that were worth approximately $1 million by this point. DE 1 ¶ 81.

Boucher obtained an opinion letter from the Las Vegas Attorney on June 1, 2017, for Transfer Agent 1, and he obtained an opinion letter from Lloyd for the Broker on June 12, 2017. These letters were essentially identical to the prior opinion letters. DE 1 ¶ 82. Boucher again executed a representation letter to Lloyd, dated June 2, 2017, in which he falsely stated that he would "not undertake any re-sale of the Shares in concert with any other persons," that DOLV was not a shell company, and that the transaction was "not part of a scheme to evade the 1933 Act registration requirements." DE 1 ¶ 83. Between June 8 and July 20, 2017, Boucher sold the shares (plus some additional shares from prior issuances), totaling more than 12.7 million shares, for proceeds of approximately $781,000. DE 1 ¶ 85.

On July 26, 2017, Boucher acquired an additional $3,650 of DOLV debt from the Accounting Note for a purchase price of $40,000, which he again paid to Oravec's company, Pivo, even though the debt was ostensibly owned by the Translator. The debt was convertible into 36.5 million shares worth approximately $2.09 million by this date. DE 1 ¶ 86. Boucher again obtained opinion letters from the Las Vegas Attorney to Transfer Agent 1, and from Lloyd to the Broker, stating that the shares could be sold without restriction. DE 1 ¶ 87. To obtain the opinion letter from Lloyd, Boucher again executed a false representation letter, dated August 12, 2017, stating that he would "not undertake any re-sale of the Shares in concert with any other persons," that DOLV was not a shell company, and that the transaction was "not part of a scheme to evade the 1933 Act registration requirements." DE 1 ¶ 88. Boucher deposited the shares with the Broker, which removed its internal restrictions on the shares. DE 1 ¶ 90. Between

August 21 and November 3, 2017, Boucher sold more than 35.5 million DOLV shares, for proceeds of approximately $1.86 million. DE 1 ¶ 91.

### D.  The Proceeds of Boucher's Conversions

In total, Defendant Boucher converted and sold 101 million DOLV shares for proceeds of approximately $3.88 million, a significant portion of which he funneled back to Defendants Thurlow and Fidler through various transactions. DE 1 ¶¶ 92-96. In addition, Oravec paid Fidler $59,875 for legal services related to DOLV from the proceeds of the DOLV debt sales assigned to him by the Translator. DE 1 ¶ 97. Further, Oravec paid $50,000 to Thurlow's company and sent additional sums to Thurlow's wife to benefit Thurlow. *Id.*

## IV.  The 2017 Convertible Note

In May 2017, Fidler and Thurlow discovered that DOLV owed $1,200 to its former transfer agent ("Transfer Agent 2") for services rendered in or about 2012. Thurlow arranged for Jordan/WBC to purchase the outstanding receivable from Transfer Agent 2 by paying it the balance owed. DE 1 ¶ 98. In forms substantially identical to the Accounting Note he drafted in 2016, Thurlow prepared corporate resolutions making the $1,200 debt owed to Transfer Agent 2 convertible to 7,000,000 DOLV shares at $0.0001 per share (the "2017 Convertible Note"), a steep discount to the then-current trading price of $0.0062 per share. The note's value was approximately $434,000, more than 366 times the face value of the debt. DE 1 ¶ 99.

Thurlow also drafted the debt assignment, transfer, and conversion documents relating to the 2017 Convertible Note. DE 1 ¶ 101. The documents included Wang's (DOLV's president's) signature, yet that signature does not match prior versions of Wang's signatures that appeared on documents executed in December 2016 in connection with the reverse merger or in March and April 2017 in connection with the debt conversions by Boucher and Jordan/WBC. *Id.*

V.     **The July and October 2017 Bradley Fidler Debt Purchases, Conversions, and Share Sales**

A.  **July 2017**

Jordan sold the debt from the 2017 Convertible Note to Bradley Fidler for $1,250, which Fidler paid from his law firm's account. DE 1 ¶ 100. The Las Vegas attorney issued an opinion letter to Transfer Agent 1 on July 14, 2017, opining that the securities had been acquired in 2012, even though the documentation underlying the conversion indicated that the note was acquired and the securities were issued in July 2017. DE 1 ¶¶ 103-104. Fidler and Bradley Fidler provided the Las Vegas Attorney's letter to Lloyd to obtain a letter for the Broker. DE 1 ¶ 105.

Bradley Fidler executed a representation letter to Lloyd, dated August 2, 2017, in which he made numerous material misrepresentations, including: the underlying debt was from the Accounting Note (when, in fact, it was from the 2017 Convertible Note); he would not re-sell the DOLV shares in concert with others; and he had no relationship with DOLV (despite the fact that his father acted as counsel to DOLV). DE 1 ¶ 106. Lloyd issued an opinion letter to the Broker on August 3, 2017, whereupon the Broker removed its internal restrictions on the sale of the DOLV shares. DE 1 ¶ 108. Between August 8 and September 7, 2017, Bradley Fidler sold all of the DOLV shares associated with the 2017 Convertible Note for approximately $541,000. DE 1 ¶ 109.

B.  **October 2017**

On October 31, 2017, Bradley Fidler paid $50,000 to Oravec's company, Pivo, to purchase $1,200 worth of debt from the Accounting Note from the Translator. The $1,200 debt was convertible to 12 million DOLV shares worth approximately $720,000 as of that date. DE 1 ¶ 110. He obtained an opinion letter, dated November 1, 2017, from the Las Vegas Attorney to Transfer Agent 1, and he sought an opinion letter from Lloyd for the Broker. DE 1 ¶ 111.

Bradley Fidler again represented to Lloyd via letter that he would not re-sell the DOLV shares in concert with others and that he had no relationship with DOLV, even though his father was DOLV's attorney. DE 1 ¶ 112. Lloyd issued an opinion letter to the Broker, dated November 8, 2017, but the Broker refused to remove its internal restrictions on the sale of the DOLV shares. DE 1 ¶ 114. Thurlow then arranged for Bradley Fidler to sell the shares through a European brokerage firm, which deposited the $207,309 from the share sales into Thurlow's bank account in the United Kingdom on January 22, 2018. DE 1 ¶ 115. The next day, Thurlow transferred the proceeds (less 2,000 GBP) to a Roger Fidler account in the United States. DE 1 ¶ 116.

## ARGUMENT

### I.    The Legal Standard for Considering a Motion to Dismiss

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A claim has facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In deciding a 12(b)(6) motion, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in the plaintiff's favor. *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Dismissal is not warranted unless the plaintiff cannot provide the basis for his claim through factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc.*

*v. City of N.Y.*, 458 F.3d 150, 155 (2d Cir. 2005) (citations omitted); *see also Eternity Glob. Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir. 2004) (in resolving motion to dismiss, task is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered.")

To withstand a motion to dismiss under Rule 9(b), a complaint "must state with particularity the circumstances constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) "serves to provide a defendant with fair notice" of the substance of a plaintiff's fraud claim. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) (Commission's complaint met Rule 9(b)'s requirement "because it include[d] 'the who, what, when, where and why' of the SEC's claims'") (quoting *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004)). As discussed below, the SEC has fulfilled all of these requirements, and Defendants' motion should be denied.

### A. Defendants' Motion Ignores the Proper Legal Standards

In response to the SEC's well pleaded Complaint, Defendants offer no legal argument why the facts alleged do not state claims upon which relief can be granted. Instead, Defendants offer "evidence" consisting of twelve exhibits, spanning nearly 150 pages, including four affidavits and a hodge-podge of unauthenticated emails, invoices, FedEx receipts, reports, and corporate documents. (Motion Exs. B-M [DE 36-2 through DE 36-13]). From these extraneous materials, Defendants spin a counterfactual tale that the Accounting Note was created and executed by the Nominal Director in October 2015, and, therefore, the shares converted from this debt had been held for more than one year when sold in 2017, thereby satisfying any applicable holding periods under the registration requirements. Motion at 7-9. The Motion is silent as to the conversion and sale of shares from the 2017 Convertible Note.

But in deciding a Rule 12(b)(6) motion, a district court must confine its consideration "'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991)); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (same); *Hernandez v. Premium Merch. Funding One, LLC*, 2020 WL 3962108, at *2 (S.D.N.Y. Jul. 13, 2020) (declining to consider certain exhibits where they relied on facts outside the complaint).[3] The only documents within that standard offered by Defendants are two different versions of the falsely dated note, *see* DE 36-2 at 3-8 (attached to Stein Affidavit); DE 36-9 at 6-12 (attached to Holman Affidavit), neither of which contradicts the SEC's claims that they were falsely dated. Other documents offered by Defendants actually support the SEC's claims. *See*, *e.g.*, *infra* Section II.B.v (concerning fraud claims) and n. 4 (concerning the Section 5 claims).

While the SEC possesses evidence rebutting Defendants' proffered evidence, "a court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'" *SEC v. Sugarman*, 2020 WL 5819848, at *8 (S.D.N.Y. Sept. 30, 2020) (quoting *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 749 (S.D.N.Y. 2018), *aff'd*, 752 F.App'x 56 (2d Cir. 2018) (citation omitted). If evidence exists or surfaces during discovery to support Defendants' arguments, they are free to make use of it in future dispositive motions. *See Glob. Network Commc'ns*, 458 F.3d at 155 (holding that motion for summary judgment, not motion to dismiss, "is the proper procedural

---

[3]     While this standard makes clear that the Court should not consider the Affidavit of Simon Piers Thurlow (DE 36-13), the SEC objects to ¶¶ 5-6 and the exhibit to Thurlow's Affidavit pursuant to Fed. R. Evid. 408 because it relates to a compromise offer and negotiation.

device to consider matters outside the pleadings, such as facts unearthed in discovery, depositions, affidavits, statements, and any other relevant form of evidence."). Accordingly, Defendants' use of purported facts outside of the Complaint is improper, and all arguments based on them should be ignored.

## II.   The Complaint Adequately Alleges Violations of the Anti-Fraud Provisions

### A.  The Antifraud Provisions of the Federal Securities Laws

The SEC alleges that Defendants Thurlow, Oravec, Boucher, and Bradley Fidler violated Section 10(b) of the Exchange Act and Rule 10b-5 and Section 17(a) of the Securities Act and that Defendant Fidler violated Section 10(b) and Rules 10b-5(a) and (c) and Sections 17(a)(1) and (3) of the Securities Act. *See generally* 15 U.S.C. §§ 77q(a) & 78j; 17 C.F.R. § 240.10b-5. These provisions are collectively referred to as "the antifraud provisions of the federal securities laws." *SEC v. Botvinnik*, 2019 WL 4738900, *3 (S.D.N.Y. Sept. 29, 2019) (Broderick, J.) (citation and quotation omitted). In sum, Section 10(b) and Rule 10b-5 require the SEC to establish that a defendant "(1) made a material misrepresentation or a material omission…, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *See*, *e.g.*, *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quoting *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013)). The elements of a claim under Section 17(a) are "'[e]ssentially the same' as the elements of claims under [Section] 10(b) and Rule 10b-5." *Frohling*, 851 F.3d at 136 (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

The SEC adopted Rule 10b-5 to make the prohibitions in Section 17(a), which applies in connection with the "offer and sale" of a security, applicable to "purchasers" of securities as well. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011). Where the misleading statements and deceptive conduct can be directly tied to the entire offering and distribution

14

process, such statements and conduct are considered part of the "offer and sale" process. *See United States v. Naftalin,* 441 U.S. 768, 773 (1979) (explaining that Section 17(a)'s "'in' the 'offer' and 'sale'" language was "expansive enough to encompass the entire selling process").

Typically, information is considered material if there is a substantial likelihood that a reasonable investor would consider such information "as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). "The fact that a statement is made in private—for example, to a transfer agent—rather than to the public does not foreclose a statement's materiality . . . Insofar as [an] attorney's opinion letter and other documents necessarily inform the transfer agent's decision, misrepresentations in such documents may be considered important by the reasonable investor." *SEC v. Sayid*, 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019) (internal quotation and citation omitted) (alteration in original); *see also SEC v. Czarnik*, 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010) (same).

"A false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'" *Frohling*, 851 F.3d at 136 (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)). Scienter can also be established through a showing of recklessness, i.e., "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* at 136 (citing *Obus*, 693 F.3d at 286). Section 17(a)(3) of the Securities Act does not require scienter. *Monarch Funding*, 192 F.3d at 308 (citing *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980)).

### B. Defendants' Liability under the Antifraud Provisions

#### i. The Complaint Sufficiently Alleges Violations of Sections 17(a)(2) and Rule 10b-5(b) by Thurlow, Oravec, Boucher, and Bradley Fidler

The SEC adequately pleaded the alleged fraudulent conduct in sufficient detail to allow the Court to conclude that it alleged that Thurlow, Oravec, Boucher, and Bradley Fidler made (in

violation of Rule 10b-5(b)) or obtained money or property (in violation of Section 17(a)(2)) by means of material misstatements of fact or omissions of material facts necessary to make the statements made not misleading. For example, the Complaint alleged that Thurlow drafted the Accounting Note in 2016 and falsely dated it "October 13, 2015," in an effort to make it appear as if the convertible debt met the one-year holding requirement of Rule 144(d)(1)(ii) . DE 1 ¶ 37; *see also infra* Section III.B (discussing exemptions and safe harbors). Oravec obtained the Accounting Firm owner's signature on the Accounting Note in or around December 2016, DE 1 ¶ 38, yet then provided the misleadingly dated note, together with Thurlow, to the attorneys issuing the opinion letters while omitting the fact that it had been backdated. DE 1 ¶¶ 48-49, 54-55, 61-62, 72. In his communications with attorney Lloyd, Oravec made separate misleading statements that the Accounting Note was from 2015. DE 1 ¶¶ 54, 61-62, 72.

Boucher and Bradley Fidler made materially misleading statements and omissions in their representation letters to Lloyd in the process of procuring an opinion from him (to pass along to the Broker) that the shares were freely tradable. DE 1 ¶¶ 55, 72, 75, 78, 83, 88, 106. Specifically, both Defendants represented that DOLV had not been a shell issuer for the prior twelve months, a statement that they knew or were reckless in not knowing was false. DE 1 ¶¶ 104-105. Boucher represented at least four times that he would "not undertake any re-sale of the [Dolat] Shares in concert with any other persons," when he knew that he was acting in concert with at least Thurlow. DE 1 ¶¶ 55, 75, 83, 88. In doing so, as the Complaint pleads, Boucher knew, recklessly disregarded, or had reason to know that these representations were materially misleading. DE 1 ¶¶ 55, 76, 84, 89. Bradley Fidler made a similar misrepresentation when he knew that he was acting in concert with Fidler and Thurlow, yet he failed to disclose that fact. DE 1 ¶¶ 106-07. Finally, Bradley Fidler knew or was reckless in not knowing that his

16

description of the July 2017 conversion transaction was false because it described the convertible debt as Accounting Note debt, when in fact the debt originated with the 2017 Convertible Note. DE 1 ¶¶ 110-112. In addition to deceiving the attorneys, the misrepresentations described above were used to deceive Transfer Agent 1 and the Broker into removing the restrictive legends from the shares. *See, e.g., Czarnik*, 2010 WL 4860678, at *4 (denying motion to dismiss involving attorney misrepresentations to transfer agents).

The Complaint adequately alleges that these misstatements were material because, without them, the attorneys would not have issued the opinion letters, and at least the Broker would not have removed its internal trading restrictions on the DOLV shares. DE 1 ¶¶ 53, 57, 62, 65, 78, 90, 108, 114. *See SEC v. Ramoil Mgmt., Ltd.*, 2007 WL 3146943, at *7 (S.D.N.Y. Oct. 25, 2007) (finding "clear" materiality of statements in attorney opinion letter where "stock would not have issued" without the statements); *Sayid*, 2019 WL 6307367, at *7-8 (finding no genuine dispute that defendant's statements to attorney and provision of falsely-dated documents in obtaining opinion letter were material because "[w]ithout [defendant's] false statements, [attorney] would not have issued the letters, and [transfer agent] would not have issued the…stock…in unrestricted form."). With respect to Section 17(a)(2) of the Securities Act, Thurlow and Oravec obtained money from the misleading statements or omissions through the moneys funneled back to Thurlow from Boucher and paid to Oravec by Boucher and Jordan/WBC. DE 1 ¶¶ 4, 7, 59. Boucher and Bradley Fidler received the proceeds from their sales of DOLV shares to the public. DE 1 ¶¶ 58, 79, 85, 91-92.

### ii. The Complaint Sufficiently Alleges Violations of Sections 17(a)(1) and (2) and Rules 10b-5(a) and (c) Against the Fraud Defendants

The Complaint alleges that the Fraud Defendants used a "device, scheme, or artifice to defraud" (violating Section 17(a)(1) and engaged in an "act, practice, or course of business that

operates or would operate as a fraud or deceit," either upon the purchaser (in violation of Section 17(a)(3)) or upon any person (violating Rule 10b-5(c)). *See* 15 U.S.C. § 77q(a)(1) and (a)(3); 17 C.F.R. § 240.10b-5(a) and (c). The facts as pleaded involve both the above-described misrepresentations and omissions, as well as deceptive conduct. For example, Thurlow, Fidler, and Oravec engaged in a deceptive course of business when they arranged a sham convertible note transaction (the Accounting Note) as part of the reverse merger, arranged to obtain signatures on the backdated Accounting Note, and drafted false documentation to make it appear as if the Translator who owned the Accounting Note was not an affiliate of the issuer in order to deceive the attorneys, Transfer Agent 1, and the Broker into believing that the DOLV shares could be freely sold. DE 1 ¶¶ 34-35, 38-40, 46, 49, 50, 52, 61, 73-74, 102-03, 105. They also doctored dates and fabricated signatures on documents to pursue further conversions and sales in connection with the 2017 Convertible Note. DE 1 ¶¶ 98-99, 101-04. Boucher arranged for proceeds of the DOLV offerings to be funneled back to Thurlow, Fidler, and Oravec in sham transactions. DE 1 ¶¶ 93-94. Oravec, in turn, paid some of those funds to Thurlow and Fidler. DE 1 ¶¶ 97, 113. Bradley Fidler, in addition to his misrepresentations, arranged for the proceeds of his sales to be sent to Fidler via offshore banks and entities in order to conceal that the true beneficiary of his sales was his father. DE 1 ¶¶ 113, 116.

### iii.  The Complaint Sufficiently Alleges Scienter

Further, the Complaint adequately pleads scienter by alleging, among other things, that Thurlow backdated the Accounting Note (and thus knew that he did so), and Oravec and Fidler knew that the signatures on the Accounting Note were misdated, *e.g.*, DE 1 ¶¶ 35, 37-38, 48, yet provided the misdated Accounting Note to the transfer agent and attorneys. Thurlow, Fidler, and Oravec knew or were reckless in not knowing that obtaining backdated signatures, falsifying dates and signatures, and otherwise drafting false documentation constituted deceptive conduct

18

or a deceit upon the purchasers—i.e., the public purchasers of the shares. *E.g.*, DE 1 ¶¶ 48, 49, 54, 60, 105. All of the Fraud Defendants knew or were reckless in not knowing that selling the DOLV shares on behalf of the issuer and funneling the sale proceeds back from public sellers in sham transactions or, in the case of Bradley Fidler, to his father, were deceptive acts.

### iv.   The Fraud Was in Connection with the Sale of Securities

The misleading statements and deceptive conduct discussed above were directly tied to the entire offering and distribution process, and, therefore took place in the offer, purchase, and sale of securities. *See United States v. Naftalin,* 441 U.S. 768, 773 (1979) (explaining that Section 17(a)'s "'in' the 'offer' and 'sale'" language was "expansive enough to encompass the entire selling process"). The purportedly convertible Accounting Note and 2017 Convertible Note led to multiple conversions of DOLV debt to securities and sales to the public throughout 2017 by the Fraud Defendants. DE 1 at Table 1; DE 1 ¶¶ 42, 43, 45, 59, 70, 72, 92. The sales were made possible by the Fraud Defendants' misstatements, omissions, and deceptive conduct in dealing with Transfer Agent 1 as described above. DE 1 ¶¶ 46, 50, 52, 61, 74, 82, 87, 102-03, 105, 111. All of the Fraud Defendants knew or were reckless in not knowing that selling the DOLV shares on behalf of the issuer or its affiliates and funneling the proceeds of those sales back from public sellers in sham transactions or, in the case of Bradley Fidler, to his father via a transfer to Thurlow's UK account, were deceptive acts. DE 1 ¶ 113.

Because the SEC adequately pleaded its claims, Defendants' motion should be denied.

### v.   Defendants' Response to the Allegations Does Not Undermine the Adequacy of the Pleading

The thrust of Defendants' arguments is that—despite not even addressing the allegations concerning the 2017 Convertible Note—purported "evidence" outside the Complaint "contradicts" the SEC's "unsubstantiated" claims. Motion at 23. As noted above in Section I.A,

this contention is not properly made on a Rule 12(b)(6) motion. Moreover, Defendants'

"evidence" not only does not undermine the SEC's allegations—which must be accepted as

true—but also demonstrates that basis for the SEC's fraud claims. By way of example, while

Defendants contend that the Nominal Director verified his signature on the Accounting Note in

his affidavit (DE-36-2 ¶ 3), *see* Motion at 6-8, 21-22, he makes no statement whether he actually

signed the note, or, if he did, on what date he did so (DE 36-2), and in fact, in an email to

Defendant Fidler exhibited to Defendants' Motion, stated "I never signed any promissory

note[.]" DE 36-3. Defendant Thurlow's self-serving affidavit claims he found the Accounting

Note "in a box . . . in August of 2016," DE 36-13 ¶ 3, yet the version attached to another

affidavit offered by Defendants is partially unsigned. DE 36-9 at 12. The opinion letter of

Benjamin Bunker, Esq., DE 36-6, demonstrates Bunker's reliance—and therefore the

materiality—of the falsely dated Accounting Note and Boucher's representations to him.

Accordingly, even if the Court were to consider Defendants' improperly submitted

"evidence," their motion should be denied.

## III. The Complaint Adequately Alleges that Defendants Violated the Securities Registration Provisions of Section 5 of the Securities Act

### A. The SEC Adequately Pleaded a *Prima Facie* Case Against Defendants

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through

the mail or interstate commerce unless a registration statement has been filed and is in effect. 15

U.S.C. § 77e(a). Section 5(c) prohibits the offer to sell securities through the mail or interstate

commerce unless a registration statement has been filed. 15 U.S.C. § 77e(c). The purpose of the

registration requirement is to "protect investors by promoting full disclosure of information

thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119,

124 (1953). "Registration of a security is 'transaction-specific,' in that the requirement of

registration applies to each act of offering of sale[.]" *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998)).

To establish a *prima facie* case under Section 5, the Commission need only allege the following: (1) that no registration statement was filed or was in effect as to the securities in question; (2) that the defendant, directly or indirectly, sold or offered to sell these securities; and (3) that in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). No scienter is required to establish a Section 5 violation. *Id*.

Even if they do not offer or sell a security, defendants may be liable for violating Section 5 if they have "'engaged in steps necessary to the distribution of [unregistered] security issues.'" *Universal Express, Inc.*, 475 F. Supp. 2d at 422 (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)). The necessary participant test "'asks whether, but for the defendant's participation, the sale transaction would not have taken place.'" *SEC v. Mattera*, 2013 WL 6485949, at *10 (S.D.N.Y. Dec. 9, 2013) (citation omitted) (quoting *Universal Express, Inc.*, 475 F. Supp. 2d. at 422 (S.D.N.Y. 2007)).

The Complaint adequately alleges a *prima facie* case that all Defendants violated Section 5. First, the Complaint alleges that no registration statement was filed or in effect as to the DOLV shares sold into the public market in 2017. DE 1 ¶¶ 3, 7. Second, the Complaint alleges that Boucher, Jordan/WBC, and Bradley Fidler sold or offered to sell DOLV securities, and that Thurlow, Fidler, and Oravec engaged in steps necessary to the distribution of the unregistered securities by coordinating the issuance of attorney opinion letters to allow for the transfer and

sale of the shares. *E.g.*, DE 1 ¶¶ 42-49, 52, 54-55, 58-64, 66, 70-72, 75, 79-80, 82-83, 85-88, 90-97, 100-102, 105-106, 109-112, 114-116. Third, the Complaint alleges that each Defendant used communications in interstate commerce and the mails in connection with the offers and sales. *E.g.*, DE 1 ¶¶ 46-49, 52, 54-56, 60-62, 64, 71-72, 75, 77-78, 82-83, 87-88, 102, 105-106, 111-112. Thurlow and Oravec organized the reverse merger and the backdating of the Accounting Note, coordinated the issuance of opinion letters for Boucher and Jordan/WBC, and, along with Fidler, coordinated and reviewed DOLV's press release issued during the sales to the public. *E.g.*, DE 1 ¶¶ 33-39, 46, 47, 52, 61-63, 67-68, 71-72, 76. Fidler acted as legal counsel in the reverse merger, obtained signatures on the Accounting Note, along with Thurlow and Oravec, and coordinated opinion letters and the deposit of shares for Bradley Fidler. *E.g.*, DE 1 ¶¶ 30, 33, 38, 102-03, 105. In addition, Oravec acted as the intermediary between Thurlow/Fidler and the Chinese nationals during the reverse merger and acted as DOLV's investor relations contact. *E.g.*, DE 1 ¶¶ 21, 31-32, 35-36, 44, 86. As such, Defendants' motion should be denied.

### B.  No Exemption Applies

Defendants do not dispute that they engaged in sales of unregistered securities but instead argue that a registration exemption under Rule 144 applied to the DOLV stock sales. Motion at 23-27. The Commission is not required to plead the inapplicability of particular exemptions. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (once Commission establishes *prima facie* violation of Section 5, defendants bear burden of proving that an exemption applies (citing *Ralston Purina Co.*, 346 U.S. at 126)). Nevertheless, we explain here why the registration exemption was unavailable to Defendants.

### i. Exemptions from the Registration Requirements Do Not Apply to Defendants' Offerings

Section 4(a)(1) of the Securities Act exempts from registration "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). A party is an "underwriter" under Section 2(a)(11) of the Securities Act if (1) he purchases shares from an issuer (2) with a view to a distribution of the security. 15 U.S.C. § 77b(a)(11). For purposes of the definition of "underwriter" in Section 2(a)(11), an "issuer" is additionally defined to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." 15 U.S.C. § 77b(a)(4). Securities Act Rule 405 defines the term "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *see also SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) (where sellers of securities under common control with individuals who purchased securities and sold them to the public were underwriters). Control "depends upon the totality of the circumstances" and may be established even though a person does not own a majority of the stock and control may rest with more than one person at a time. *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976).

As alleged in the Complaint, Boucher, Jordan/WBC, and Bradley Fidler acted as underwriters because they purchased the convertible debt of DOLV from an affiliate of the issuer, the Translator, with a view toward distribution of the securities as evidenced by their prompt sales following the conversion into shares. The SEC pleaded facts from which the Court may infer that the Translator was an affiliate or acted under control of the issuer: as part of the reverse merger transaction, he purchased the Accounting Note from the Accounting Firm's owner, DE 1 ¶ 36; he sold the debt from Accounting Note to Boucher, Jordan/WBC, and Bradley

Fidler shortly thereafter, DE 1 ¶¶ 44, 70, 80, 86; and, instead of claiming the proceeds of those

sales, he directed Oravec to use them to advance DOLV's interests in the United States by, for

example, updating DOLV's OTC Markets listing, DE 1 ¶ 44.[4]

In addition, in selling shares converted from the Accounting Note, Bradley Fidler acted

as an underwriter because he acted under common control with the seller of the securities as in

*Kern. See* 425 F.3d at 149-50. Fidler, who was DOLV's U.S. counsel, Thurlow, and Oravec

(DOLV's investor relations representative) negotiated and structured the reverse merger between

DOLV and JBZY, and they effectively controlled DOLV within the United States, including

working to bring its listing to "current" status on OTC Markets and issuing press releases on

behalf of the company. DE 1 ¶¶ 33, 41, 44, 67-68. They orchestrated the sales of debt from the

Accounting Note to Boucher and Jordan/WBC, as well as the sale of debt from the 2017

Convertible Note from Jordan to Bradley Fidler. DE 1 ¶¶ 42, 43, 100-01.

Accordingly, the Section 4(a)(1) exemptions did not apply to Defendants' distributions.

### ii.   "Safe Harbors" Did Not Apply to Defendants' Distributions

Rule 144 is a safe harbor for purchasers' resales of restricted securities. Pursuant to Rule

144(d)(1)(ii), where an issuer is not subject to the reporting requirements of Section 13 or 15(d)

of the Exchange Act, "a minimum of one year must elapse between the later of the date of the

acquisition of the securities from the issuer, or from an affiliate of the issuer, and any resale of

such securities in reliance on this section for the account of either the acquiror or any subsequent

---

[4]   Should the Court consider Defendants' improperly submitted evidence, it actually
establishes the SEC's claim that the Translator was an affiliate of DOLV. The Translator stated
in his affidavit appended to the Motion that, to pay for legal and accounting work to be done in
the United States on behalf of DOLV, he arranged to assign to Oravec's company, Pivo, "the
proceeds from my notes that would be sold to a number of U.S. investors on an unsolicited
basis." *See* Motion Ex. 4 (DE 36-4), ¶¶ 6-8.

holder of those securities." 17 C.F.R. § 230.144(d)(1)(ii). An "affiliate" is any person who directly or indirectly controls or is controlled by, or is under common control with, an issuer. 17 C.F.R. § 230.144(a)(1). Rule 144's safe harbor is unavailable for the resale of securities initially issued by a shell company. The term "shell company" means an issuer that has, or *at any previous time* had, no or nominal operations, and either (i) no or nominal assets, (ii) assets consisting solely of cash or cash equivalents, or (iii) assets consisting of any amount of cash or cash equivalents and nominal other assets. 17 C.F.R. § 230.144(i)(1)(i)-(ii) (emphasis added). The SEC alleged sufficient facts to conclude that DOLV was a shell company. *See*, *e.g.*, DE ¶¶ 2 and 51.

Defendants—ignoring the claims concerning the 2017 Convertible Note entirely— contend that their sales satisfied a six-month holding period (17 C.F.R. § 230.144(d)(1)(i)), applicable because DOLV was "a reporting company" at the time of the stock sales and because the sales took place in 2017, more than one year after the date on the 2015 Accounting Note. Motion at 26-27. But Defendants are incorrect in multiple respects.

As an initial matter, the SEC alleged that the Accounting Note was falsely dated. Second, the Rule 144 safe harbor is inapplicable because the SEC alleged that DOLV was a "shell company," given that it had no or nominal operations and no assets. DE 1 ¶¶ 2, 51, 55. Citing documents filed with their Motion, Defendants argue that DOLV was not a shell company because it had total assets of $2.7 million *in 2017* and because JBZY purportedly continued to manufacture electric cars and car batteries and owned six patents. Motion at 24-25, Exs. K-L (DE 36-11 & DE 36-12) (emphasis added). But these purported facts cannot be considered on a motion to dismiss. (*See supra*, Section I.A). Nor do they address whether DOLV was a shell

company at any previous time, which renders the Rule 144 safe harbor unavailable. *See* 17 C.F.R. § 230.144(i)(1)(i)-(ii).

Third, even if the SEC had not alleged that DOLV were a shell company, the holding period was one year because DOLV was not a reporting company. 17 C.F.R. § 230.144(d)(1)(ii). The Court may take judicial notice of DOLV's publicly filed Form 15-12B, Voluntary Suspension of Duty to File, dated May 2, 2014 (attached hereto as Exhibit A),[5] under which DOLV suspended its obligation to file periodic reports.

Defendants also claim that "there are several opinion letters written by securities attorneys opining that neither DOLV nor JB&ZJMY [sic] were shell companies, based on their extensive investigation of relevant documents." Motion at 25. But, setting aside that the SEC alleges that these letters were fraudulently obtained, *e.g.*, DE 1 ¶¶ 46-57, 78, 83-84, 88-89, 106-107, there is no scienter requirement with respect to Section 5 claims by the Commission. *See Cavanagh*, 1 F. Supp. 2d at 361. As such, even if the argument were appropriate under Rule 12(b)(6), purported reliance on the fraudulently obtained opinion letters does not negate any element of the SEC's Section 5 claims. Accordingly, accepting the acts alleged in the Complaint as true and construing all reasonable inferences in Plaintiff's favor, Defendants cannot establish that the safe harbor applied on their motion to dismiss.

## IV.   The Complaint Adequately Alleges Aiding and Abetting Claims

The Complaint alleges that Defendants Thurlow, Boucher, Fidler, Bradley Fidler, and Oravec also aided and abetted each other's violations of Sections 17(a)(1) and (3)), Section 10(b), and Rule 10b-5(a) and (c). DE 1 ¶¶ 132-36 (alleging claims under 15 U.S.C. § 77o(b),

---

[5]      Available at
https://www.sec.gov/Archives/edgar/data/1436568/000143656814000005/1512g.txt.

78t(e)). To adequately allege aiding and abetting, the Commission must plead: (1) "the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;" (2) knowledge or reckless disregard "of this violation on the part of the aider and abettor;" and (3) "'substantial' assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (citing *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)). To satisfy the "substantial assistance" component of aiding and abetting, the SEC must show that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (alterations in original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). In *Apuzzo*, the Second Circuit cited, as facts tending to show the requisite involvement, that the defendant "agreed to participate" in the relevant transactions and that he "approved or knew about" fraudulent invoices that he knew were "designed to further the fraud." *Id.* at 214.

The Motion is silent as to whether the Complaint adequately pleads aiding and abetting claims. For the reasons described above, the Fraud Defendants all knowingly participated and provided substantial assistance to the fraudulent conduct of the other Fraud Defendants.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied.

Dated: New York, New York
     January 27, 2022

                                       ___/s/ Victor Suthammanont_____
                                       Victor Suthammanont
                                       Mary Kay Dunning
                                       Ladan F. Stewart
                                       Attorneys for Plaintiff
                                       SECURITIES AND EXCHANGE
                                     COMMISSION
                                     New York Regional Office
                                     200 Vesey Street, Suite 400
                                     New York, New York 10281
                                     (212) 336-5674 (Suthammanont)
                                     SuthammanontV@sec.gov